[No. 25672. Department Two. August 13, 1935.]

DOROTHY WILLIAMSON, *Appellant,* v. MARY WILLIAMSON, *Respondent.*[1]

[1] Reported in 48 P. (2d) 588.

72

*Spencer Gray* and *Eli M. Paulson,* for appellant.

*J. L. Corrigan,* for respondent.

BLAKE, J.—This is an action for alienation of affections. Plaintiff is the wife of William Williamson, and the defendant is his mother. At the close of plaintiff's evidence, defendant made a motion for nonsuit, which the court granted. From judgment dismissing the action, plaintiff appeals.

Appellant first met William in the fall of 1929, when she was fifteen years old. William was some years older. Their acquaintance quickly ripened into a very genuine affection. They saw much of each other, with the apparent approval of appellant's parents, and without disapproval on the part of respondent. On Thanksgiving day, 1930, Easter, 1931, and Dorothy's birthday, 1931, respondent was a guest at the home of appellant's parents. On those occasions, according to the testimony, the prospective marriage of William and Dorothy was discussed. Mrs. Williamson raised no objections.

During the courtship, Dorothy was, from time to time, a guest in the home of respondent. On one occasion, she attended a tea given by respondent, who introduced her as "Bill's fiancee." Throughout the courtship, respondent, at least quiescently, approved

of the affair. On two occasions, however, when the subject of marriage as an imminent probability was broached, she demurred, saying that Bill should not get married until he got a job.

William gave Dorothy an engagement ring, for which respondent was apparently called upon to pay. For, some time afterward, respondent demanded the ring, and Dorothy surrendered it to her. William was never self-supporting. He had had a job or two, but, in the main, he was dependent on respondent for support. And she supported him right well—supplying him with an automobile and the means to operate it—maintaining him in her home. In June, 1932, she paid his expenses on a trip to Ireland, from which he returned on August 11th.

He was met at the boat by appellant, who informed him that she was pregnant. William agreed that marriage was the only alternative, but said he wanted to talk to his mother first. They were married, however, on August 13th, without consulting respondent or the parents of appellant. A day or two later, they went to the home of appellant's parents, where they lived as husband and wife until the latter part of September, when William left and returned to his mother's home.

His reasons for leaving may be best explained in his own words. He wrote:

"Dearest Dot:

"I know that you will remember that when I first came back and the very night I asked you to wait for a couple days longer so I could talk things over with my mother and you refused even on the day we were married I tryed to get you to waite, but you said that day or never. What could I do. I wanted you and also new that with all the haist would only make things worst with my folks. I wanted to wate talk to her first everything would be ok now what is it deprived of everything I once had. All the things I want even to shows, ect. I can't take care of my car the way I—

It nead work and money put on it. I am not going away from you because I do not love you. I can't stand it. I want what I am used to and I can't get it with you. I will go home after a few weeks. I asked you to let this trouble be ours only. But since it is to be public I—you win I loose I refuse to do anything where I only one against all of you. Tell Bertha to send over for a rope. (If she wants she can have her money). Don't care I can't touch the car for I don't owne it. If you do not want the kid, give him to me, and for any word you whant to send me Mr. John Williamson can take it. I will keep in constant connection with him.''

Subsequent to the marriage, respondent refused to see appellant and rebuffed all advances made by her and her parents. Respondent cut off William's credit and ceased to supply him with money. In this course of conduct, respondent was perfectly justified. *Stanley v. Stanley*, 27 Wash. 570, 68 Pac. 187; *Young v. Young*, 8 Wash. 81, 35 Pac. 592. In the last cited case, the court said:

''Appellants were under no legal obligation to provide a home either for her or her husband. And granting that they drove her away without provocation, and simply permitted but did not persuade or otherwise influence their son, her husband, to remain with them, still no action can be maintained against them therefor. While the appellants would have no right to prevent their son from following his wife wherever she might choose to go, they certainly would not be liable in an action for damages by reason of his refusing to do so, without proof that such refusal was the result of the exercise of some improper influence by them.''

It is apparent, under this authority and the facts thus far narrated, that respondent had not rendered herself liable to appellant in damages for alienation of William's affections. But the story does not end here. Upon William's return home, he was immediately restored to his former position of ease and af-

fluence. He was restored to the use of his car. In August, 1933, he went to San Francisco, and from there to Annapolis—then back to San Francisco. He drove from Seattle to San Francisco. His car was shipped to Annapolis and back to San Francisco, where William has since resided. Respondent herself testified:

"I paid his expenses both ways and I have supported him since his return home and while he has been out of the state, the same as I did before he married. William is now in San Francisco. I have never seen Dorothy's baby except in court."

Now, the question is: Why did William leave Dorothy? If he left her of his own volition, of course, respondent is not liable. If, however, the separation was effected by malicious conduct or persuasion, designed to that end on the part of respondent, she is liable. The presumption is that whatever she did or said was without malice or design to alienate William's affections. *Cramer v. Cramer,* 106 Wash. 681, 180 Pac. 915. But malice may be inferred from conduct. *Thomas v. Lang,* 135 Wash. 675, 238 Pac. 626.

Now, considering the facts in the light of these rules, we think that there are two things about which the minds of reasonable men can hardly differ: (1) That William's love for Dorothy was not strong enough to withstand the temptation of the "flesh-pots;" (2) that respondent furnished the "flesh-pots" which lured him away. That this was the cause of the separation is clear. The question then is: Was respondent's conduct motivated by a malicious design to alienate William's affection for Dorothy and effect a separation? As we said, the presumption is that it was not. But we think, under the evidence, the question is one about which the minds of reasonable men might very well differ. The evidence being sufficient to put respondent to her proof, the question is for the

determination of the jury. *Caughren v. Kahan,* 86 Wash. 356, 150 Pac. 445; *Jones v. Jones,* 96 Wash. 172, 164 Pac. 757; *Thomas v. Lang,* 135 Wash. 675, 238 Pac. 626; *Stilwell v. Stilwell,* 186 Iowa 177, 172 N. W. 177.

■ Respondent challenges the competency of the letter written by William, which we have quoted, on two grounds: (1) That, being a communication between husband and wife, it was inadmissible under Rem. Rev. Stat., § 1214 [P. C. § 7725], subd. 1, which provides:

"A husband shall not be examined for or against his wife without the consent of the wife, nor a wife for or against her husband without the consent of the husband; nor shall either, during marriage or afterwards, without the consent of the other, be examined as to any communication made by one to the other during marriage. . . ."

(2) that the declarations contained in it were hearsay and not made in the presence of respondent.

We think both grounds of objection are untenable under our decisions. The letter was written by William at or about the time of the separation. The second ground of the objection is effectually disposed of on the authority of *Jones v. Jones,* 96 Wash. 172, 164 Pac. 757. In that case the court quoted, with approval, from *Williams v. Williams,* 20 Colo. 51, 37 Pac. 614, as follows:

"Under the issue to be determined, and in connection with the testimony introduced, it was, in our opinion, proper to admit in evidence the declaration of Edward, for the purpose of showing what influenced his conduct in separating from his wife. It is true his mere declarations were not admissible to show what his mother's conduct was, nor was it, *of itself alone,* material how bad his mother's conduct was towards plaintiff; for, no matter how bad her conduct was, she could not properly be held liable in this action unless

the effect of her conduct was such as to cause Edward to become estranged from and desert his wife. From the record it clearly appears that the trial court was careful to place the declarations of the husband upon this ground. Thus limited, it was not error to admit proof of his declarations.'' (Italics ours.)

This statement is supported by the weight of authority. See 3 Elliott on Evidence, § 1648; 3 Wigmore on Evidence (2d ed.), §§ 1730, 1768.

■ This would seem to dispose of the first ground of objection as well. But cases have been cited from other jurisdictions, construing statutes similar to Rem. Rev. Stat., § 1214 [P. C. § 7725], which hold that such declarations come under the ban of the statute. *Derham v. Derham,* 125 Mich. 109, 83 N. W. 1005; *Kreager v. Kreager,* 192 Ind. 242, 135 N. E. 660; *Kiesgin v. Harness,* 242 Mich. 422, 218 N. W. 667; *Gjesdahl v. Harmon,* 175 Minn. 414, 221 N. W. 639; *Smith v. Sheffield,* 58 Utah 77, 197 Pac. 605.

It is apparent that this rule is out of harmony with the holding in *Jones v. Jones, supra.* But the statute was not under consideration in that case, and, so far as we are advised, the court has never been confronted with the precise question now presented. In construing the various subdivisions of the statute, however, the court has uniformly held that the privilege was personal to the persons designated by the terms of the statute, and that they might expressly or impliedly waive their right to give or exclude the banned evidence. *Williams v. Spokane Falls & Northern R. Co.,* 42 Wash. 597, 84 Pac. 1129; *State v. Frye,* 45 Wash. 645, 89 Pac. 170; *McCarthy v. McCarthy,* 116 Wash. 360, 199 Pac. 733.

As stated in 70 C. J., at page 380, such a statute

'' . . . merely confers the privilege of refusing to testify as to such communications and of having them excluded; . . . The prohibition arises only

when the spouse in whose favor the privilege exists demands by timely objection to the testimony that the privilege be enforced."

To hold that one standing in the position of respondent could invoke the statute, would be to extend the privilege to a class of persons entirely beyond its scope.

The judgment is reversed, and the cause remanded for further proceedings.

MITCHELL, HOLCOMB, and STEINERT, JJ., concur.