[No. 32241. *En Banc.* July 2, 1953.]

THE STATE OF WASHINGTON, *Respondent*, v. SAMUEL EM-
MANUEL, *Appellant*.[1]

[1]Reported in 259 P. (2d) 845.

*Don G. Abel, Lee Olwell, Rummens, Griffin & Short,* and *Paul R. Cressman,* for appellant.

*John Panesko* and *Alfred McBee, Special Assistant Attorney General,* for respondent.

DONWORTH, J.—The defendant was charged by information, in three counts, with the crime of bribery in violation of RCW 9.18.020 (*cf.* Rem. Rev. Stat., § 2321). The jury returned a verdict of guilty on all three counts. He then

moved for a new trial, and the motion was denied. From the judgment and sentence pronounced against him on the verdict, defendant has appealed.

The prosecuting witness, J. H. England, was engaged in the logging and timber business in Winlock, Washington. During the course of his business he purchased two tracts of timber from the state of Washington. The purchase of the first tract was made on May 20, 1941, for a consideration of $5,000 and was evidenced by timber bill of sale No. 3332. The second tract was purchased on April 25, 1945, for $7,700 and was evidenced by timber bill of sale No. 3707.

As provided by statute, RCW 79.12.120 (cf. Rem. Rev. Stat., § 7797-33), each bill of sale required that the cutting and removal of the timber be completed within five years of the date of purchase. If this were not done, the timber would revert to the state unless, in the judgment of the commissioner of public lands, the purchaser had shown good faith in attempting to remove the timber, in which case the statute authorized the commissioner to grant an extension for any period not exceeding ten years.

Mr. England had secured four successive one-year extensions with respect to the first tract. He had removed the timber from about twenty acres during this period, but the remaining sixty acres had not been touched. The last extension, which was to expire on May 20, 1950, was accompanied by a letter, dated April 25, 1949, signed on behalf of the commissioner by appellant as secretary. It advised Mr. England that the land office would grant him no further extensions on that tract. The time for removing the timber from the second tract was to expire April 25, 1950.

In late August or early September, 1949, it became apparent to Mr. England that he would not be able to remove the timber on either tract before the respective deadlines. He therefore made a trip to Olympia for the purpose of seeing the commissioner and discussing the possibility of securing a further extension on the first tract and an original extension on the second tract. The commissioner was out of town, so Mr. England asked, "Who is the next man

in charge?" He was directed to see appellant, who was a clerk in the land office and secretary to the board of land commissioners.

Mr. England then went into appellant's private office, and they talked for an hour and a half or two hours. This was the first time they had ever met. Mr. England's version of their discussion was as follows:

"A. Well, the substance of the conversation was that we saw we couldn't get that timber off and that I went up there to see what could be done towards getting a further extension. Q. And when you told him what you wanted, what did he say? A. Well, he didn't tell me I couldn't have it, nor he didn't tell me that I could, but he did tell me—that I told him that there must be something that could be done to fix it, and he told me that considering politics that it cost money to elect a Commissioner, and that the campaign hadn't been fully cleared up, and that a contribution might be warmly accepted, and I told him that if that would help my case any, I was willing to go along with it. Q. At that conversation did he give you any figure relative to the status of the campaign funds? A. Well, he said it was in the neighborhood of $8,000 in the hole, and it had come in slow. Q. All right, and then after you told him that if it would do your case any good, you were willing to contribute, did you discuss any specific amount of money you were to contribute? A. I asked him what he thought would be about right and he didn't say, and I said, 'How would $500.00 do,' and he said, 'Well, that will be all right for a starter.' Q. And what did you say? A. I said that sure, if that was going to help my business, I would just as soon throw in five hundred bucks. Q. Now then, at that meeting—how long did that meeting last, between you and Mr. Emmanuel? A. I would say between an hour and a half, and possibly two hours. Q. Did you discuss anything else besides the matter of these extensions? A. Oh, yes. Q. What else was discussed? A. Well, we talked about some timber land that we had in California and we was desirous of putting it on the market and we hadn't been able to do it; that is, successfully. And I thought it might be a good scheme if he was interested, which he told me he was—I figured it might be a good deal to enlist his services. I wasn't thinking too much about the sale of the California timber as I was about having a friend in the right spot. Q. All right, in what connection were you going to enlist his services on this California

timber matter? What was he to do? A. Oh, well, he was to sell it. Q. What, if anything, did he say to you at that time relative to whether or not he was a person who could sell it? A. Well, he told me he had a broker's license and he also said that there was numerous people came in there in the office looking for timber, which, of course, I could readily appreciate. And we finally wound up by me telling him I would be glad to have him handle it and I would be glad to pay him a commission. Q. Did you come to any terms, at that time, about the commission or how it was to be handled? A. Well, the terms, the agreement that we made at that time was that he was to sell it for so much money and we was to pay him the usual 5 per cent commission. Q. And how much money, or what price did you place on this California timber at that time? A. $350,000. Q. How much timber was there down there, Mr. England? A. Well, that is debatable —fifty-one 40's, and there was in the neighborhood of between 80 and 100 million feet. Q. What, if anything, was said at that time about reducing the agreement between you for the sale of this California timber to writing? A. Well, we agreed that I would give him an option on it and that simmered down—we also agreed at that time about the money on this other deal, this $500.00 contribution. Of course, that ostensibly was a political contribution, but we both of us knew what it was for.

"Mr. Griffin: I move the latter part of the answer be stricken and the jury instructed to disregard it.

"The Court: It will be stricken, that last statement, and the jury will disregard it.

"Q. Did you make any arrangements at that time with Mr. Emmanuel to see him subsequently? A. Yes, I did. Q. What arrangements did you make? A. Well, the arrangement was that when we got this document fixed up, why he was to—no, wait a minute, I am talking too fast. The arrangement I made at that time, he was to come down and pick up the $500.00 and at that time we made the arrangement that we was to make an option on this timber. Q. All right, let's not go so fast. You did make an arrangement that he was to come down to see you? A. Yes. Q. And did he subsequently come down and see you at Winlock? A. Yes, he came down and picked up the $500.00. Q. All right, now where did he see you, where in Winlock? A. At my house. Q. And was that the first time he had been down there? A. That was the first time he had been there. Q. About what time of the day did he come down? A. Oh, it

was in the evening, I would say it was about dark or after. Q. And he saw you at your house? A. That is right. Q. Was anybody else present when you and he were there? A. Nobody in the room. Q. Now then, what happened when he came down to see you there at Winlock the first time? A. Well, I knew what night he was coming and I had made arrangements and I had the cash for him, and when he came I gave it to him, and we subsequently talked about this option, and I told him we would soon have it ready. Then later he came down and picked it up. Q. Now then, what conversation—I want you to tell me as best you can the conversation that you had with Mr. Emmanuel at the time he came down there that first time about the $500.00. What conversation did you have with him, what did he say, and what did you say, to the best of your recollection? A. That is pretty hard to pick up, that far away, but I can give the gist of the conversation. Q. I want the gist of the conversation. A. And that was that he asked me if I had the money and I told him I had, and I handed it to him. One or the other of us remarked that money was pretty hard to identify. That was about the gist of the conversation on that."

Appellant's testimony regarding his first meeting with Mr. England was similar to the latter's testimony, except that appellant testified that, after discussing at some length the proposed sale of the timber located near Ukiah, California, Mr. England volunteered to make a contribution to the commissioner's campaign fund. Appellant testified:

"After we got through discussing it, he said, 'You know, I have tried to catch up with Mr. Taylor, I have always felt very friendly towards him, and I would like to make a political contribution to his campaign. I know it is over, but he must have a deficit,' and I said, 'Yes, he does have,' and I said, 'That is very kind of you to think of making a contribution to his campaign. I know that lots of people do that; it being a political setup, it is a common practice.' So he said, 'The next time you are down our way, when you come down to pick this up, I would like to make that contribution.' I said, 'All right.' This was about the first part of October, and a few days later I was down in Lewis county and I dropped in to see Mr. England. . . .

"Q. And thereafter did you have any occasion to see Mr. England again? A. Yes, I did. A few days later I called on Mr. England, I believe it was at his home in Winlock. Q. For what purpose, Mr. Emmanuel? A. Well, in my travels

for the State I had occasion to meet lots of people and I dropped in to see him, as I had promised him I would, and took up the matter again of the papers on the Ukiah timber deal, and we had nothing at that time in particular to discuss outside of this timber deal on this California timber, so I don't remember, I don't think there was anyone there that evening. I am quite sure I was all alone. . . .

"Q. Mr. Emmanuel, calling your attention to this second conversation or conference in Winlock with Mr. England, I will ask you whether or not at that time Mr. England paid you any money to do or not to do anything? A. He gave no money to me personally, no. Q. At that time was there any discussion about a political contribution? A. There was. Q. And what was that discussion and what took place? A. He gave me $500.00, he said, 'This is for Mr. Taylor's campaign.'"

The jury must have believed Mr. England's testimony regarding the transaction referred to in count I. It should be noted that it was not disputed that appellant received five hundred dollars from Mr. England about October 6, 1949.

A few days later (October 13, 1949), Mr. England signed and delivered to appellant an option giving him the right to purchase the Ukiah timber on or before October 12, 1950, for a net consideration of $332,500 cash.

During the next five or six months, appellant and Mr. England met several times, usually at the latter's home in Winlock, and discussed the possible sale of the Ukiah timber.

Just prior to March 30, 1950, appellant had personally prepared drafts of two letters addressed to the commissioner which formally requested that Mr. England be granted extensions of one year as to each tract. These drafts were prepared by appellant in the commissioner's office, where he secured the legal descriptions of the tracts from the official file. He denied that he saw or had knowledge at this time of the letter dated April 25, 1949, bearing his signature, which notified Mr. England that no further extensions would be granted on the first tract, although a copy of this letter was then in the file.

One of these drafts prepared by appellant for recopying bore the notation: "Mail to Sam Emmanuel, 212 North

Decatur, Olympia, Washington." This was appellant's home address. These forms were retyped on business stationery by Mr. England's daughter, Mrs. Wickert, on March 30, 1950. She gave them to her father, who signed them and handed them to appellant, together with five hundred dollars in cash. Mr. England was permitted to testify, over appellant's objection, that he had signed a check for five hundred dollars, had told his daughter to get the money from the bank, and used the cash so obtained to make this payment, which was the basis of count II.

Mr. England testified that this payment was made to appellant on April 3, 1950, and that appellant had OK'd the applications at that time. Appellant admitted receiving the sum of five hundred dollars but testified that it was another political contribution, and that the date of payment was March 31, 1950. He said the notations on the applications for extension: "O.K. 4/3/50. S.E." constituted merely his approval of the legal descriptions therein, and as a favor to Mr. England he had checked the descriptions in the commissioner's office when he returned to Olympia.

Soon thereafter, the extension on the first tract was received by Mr. England. It was enclosed with a letter dated May 12, 1950, signed by appellant. This letter stated that, because of the press of office business, the extension on the second tract had not been prepared, but that it would be completed and a copy sent to Mr. England as soon as the proper entry had been made in the office records. This extension was dated May 16, 1950, and was received by Mr. England.

The facts pertaining to count III relate to the sale of the Ukiah timber. A number of letters concerning this matter were admitted in evidence. It is not necessary to relate all the dealings between Mr. England and the various brokers who were trying to earn commissions by producing a buyer. We will limit our statement to those facts which have a direct bearing upon the issue as to the purpose of the five-thousand-dollar payment made by Mr. England to appellant on April 13, 1951.

Appellant gave one Bailey Hilton a half interest in the option, and together they continued their efforts to find a buyer for the timber during the year in which the option was in effect. They communicated with various brokers in California, in one instance suggesting a price of $414,300 (less 5% commission).

A few days before the option was due to expire (October 12, 1950), they called on Mr. England at his home and stated that they had located a good prospect and therefore desired a six-months extension on the option. At that time, they showed him a telegram from a California broker giving the name of the Union Lumber Company as an interested prospective buyer. Mr. England refused to give them this extension but did agree to extend the option until November 6, 1950, when the taxes became due on the property. Mr. England wanted to sell before then if possible.

Neither appellant nor Mr. Hilton was able to secure a buyer before the option expired.

About this time, it became apparent to Mr. England that he would still not be able to get his timber off the two tracts in Washington because bad weather was setting in. On November 9, 1950, he made written application to the commissioner for further extensions. These applications were received at the commissioner's office, and formal extensions were typed on November 16, 1950, but no notice of any approval was given to Mr. England.

After the option expired on November 6, 1950, Mr. England made arrangements to sell the Ukiah timber to one Falk, who said that he represented an undisclosed principal. The price was $365,000 cash. Soon thereafter, appellant discussed the sale with Mr. England, who told him that the buyer was an attorney named Falk who represented an unknown purchaser. Mr. England promised to let appellant know who the true buyer was as soon as he discovered his identity.

The deed from Mr. England to the Union Lumber Co. was recorded December 22, 1950. In January, 1951, appellant learned that the buyer was the Union Lumber Co. He felt that something was owing to him because it was through his

efforts that the original contact had been made with the ultimate purchaser. He discussed the matter several times with Mr. England, who refused to pay him more than one thousand dollars in compromise of his claim. Mr. England had consulted an attorney concerning his potential liability and was advised that he owed appellant nothing because he had given him an option to purchase rather than a real-estate commission contract.

Appellant made another visit to Mr. England's home early in April, 1951. Mr. England still had not received the extensions he had applied for in November, 1950. His version of their conversation was as follows:

"Well, at that time things was getting critical, it was getting very close to the deadline on that timber, on our extension, and when Mr. Emmanuel came down, I could see that we was going to have to do something that particular time, it had got pretty warm. So the thing come up and he wanted to know what we was going to do and I said, 'Well, what are you going to do?' I wanted to clear up the extensions and he wanted to clear up the subject of the commission. Well, I told him we didn't owe any commission, but we was going to have to settle it, going to have to clarify it. So I said, 'Well, how much is it going to take,' and I figured that I could probably clear it for $1,000 as I had before, but he said no. He says, 'It is going to take $5,000 *this time*.'" (Italics ours.)

Mr. England then made out a check for five thousand dollars and handed it to appellant, who handed it back, suggesting that it be endorsed to indicate that it was in payment of a commission on the Ukiah timber. He said that, since he was a licensed real-estate broker, Mr. England could use it for an income tax deduction. Mr. England so endorsed it, but on advice of his auditor never claimed it as a deduction. This five-thousand-dollar payment, which appellant contends was made in settlement of his claim for a commission in producing the ultimate buyer for the Ukiah timber, was the basis of the conviction under count III of the information.

According to Mr. England, appellant took the check and stated that he thought the extensions would be coming

through. The extensions were received by Mr. England shortly thereafter. Enclosed therewith was a letter signed by appellant on behalf of the commissioner stating that the extensions had been granted and offered the continuing co-operation of the land office.

Appellant cashed the five-thousand-dollar check and gave one half of the proceeds to Bailey Hilton, to whom appellant had given a half interest in the option.

The vital issue presented to the jury under count III was whether this payment was made and received by appellant in settlement of his claim for "a commission" in connection with the sale of the Ukiah timber or was a bribe in connection with the last extensions or partly each. The verdict on this count shows that the jury declined to believe appellant's version of the transaction.

With this general statement of the issues, we turn to a consideration of appellant's fifteen assignments of error. When necessary to an understanding of an assignment, additional facts will be stated.

■ The first assignment of error is that the trial court erred in refusing to dismiss the case at the conclusion of the state's case. Appellant did not stand upon his motion, but introduced evidence in his own defense. Consequently, the motion will be deemed to have been waived. *State v. Dildine*, 41 Wn. (2d) 614, 250 P. (2d) 951, and cases cited.

The second and third assignments of error challenge the sufficiency of the evidence to support a conviction under any of the counts of the information and predicate error on the denial of appellant's motion to dismiss at the close of the case.

■ As to counts I and II, the evidence is said to be insufficient to sustain a conviction because there was no showing that on or about October 6, 1949, and March 30, 1950, there were any applications for extensions pending before the commissioner, as alleged in the information. There is no statutory provision specifying the form which an application for extension must take. RCW 79.12.120 (*cf.* Rem. Rev. Stat., § 7797-33) merely grants the commissioner the power to extend the time for removal upon payment of the required

fee if, in his judgment, the purchaser is acting in good faith in endeavoring to remove the timber. In the absence of any formal requirements, the record discloses ample evidence from which the jury could have found that applications for extensions had been made and were pending on the dates in question.

The evidence also entitled the jury to find that the processing of applications was within the "opinion, judgment, action, decision and official proceedings" of appellant in his official capacity. While it is true that the duties of board secretary are not prescribed by statute, this is not necessary to sustain a conviction for asking and receiving a bribe. It is sufficient if the state officer, agent or employee is given such official duties by direction of his superiors or by custom of the office. *State v. Emmanuel, ante* p. 1, 253 P. (2d) 386.

In this case, appellant was secretary to the board of state land commissioners and a clerk in the commissioner's office, where applications for extensions are processed. In the course of his work, he performed the following acts with respect to applications: He signed a letter dated April 25, 1949, advising Mr. England that no further extensions would be granted for the first tract; thereafter discussed the matter of extensions with Mr. England; prepared rough drafts of forms used by him to apply for extensions; placed his O.K. upon the formal applications on April 3, 1950; signed a letter dated May 12, 1950, which enclosed one extension and promised the other; and on April 19, 1951, signed the letter of enclosure which accompanied the two extensions granted at that time.

The third respect in which the evidence is claimed to be insufficient to support the verdict on any count is that there was no showing of an "understanding or agreement." Appellant contends that, in view of this wording in the bribery statute, it is necessary to show that an actual agreement or understanding was arrived at by the parties. Where the crime charged is that of *asking* a bribe, it is not necessary to prove that an understanding in the sense of an agreement with the party approached existed. It is sufficient to show

an understanding on the part of the bribe seeker that his official action will be influenced by the payment. *State v. Emmanuel, supra,* and cases cited.

Assignments of error Nos. 4 and 5 assert that the court erred in permitting Mr. England and his daughter, Mrs. Wickert, to testify how the money was obtained which he used to make the payments specified in counts I and II of the information and in admitting in evidence certain checks which were used to obtain the money from the bank. Appellant's counsel objected to this testimony as to the source of the five hundred dollars used to pay appellant on the dates specified in counts I and II, on the ground that it was incompetent, irrelevant, and immaterial and hearsay.

That such evidence was not inadmissible on these grounds, is shown by the cases of *People v. Vollmann,* 73 Cal. App. (2d) 769, 167 P. (2d) 545, and *Commonwealth v. Swift,* 44 Pa. Super. Ct. 546. In the latter case, appellant was indicted for corruptly soliciting, demanding, and receiving a bribe from one Klein. Klein was permitted to testify as to where the sum of money came from. This was objected to as irrelevant and incompetent. The court in ruling on this said:

"Now when the commonwealth followed this up with evidence tending to show that the appellant received some of this money, we fail to see that the testimony was either irrelevant or incompetent. The commonwealth alleging that Klein received money for the purpose of bribing members of common council, and especially the defendant, surely had a right to show that Klein received the money and who from."

Where sufficient evidence is established from which the inference can reasonably be drawn that the money in question found its way into the appellant's possession, such evidence is admissible. *People v. Vollmann, supra; People v. Bissert,* 71 App. Div. 118, 75 N. Y. S. 630. The trial judge evidently had this rule in mind when he overruled appellant's objection and said:

"I think I will permit him [England] to answer. It seems to me—I assume it would have to be connected up, it is one step in corroboration, otherwise I don't see any relevancy to it at all. There is the testimony that the amount was paid."

The state immediately introduced testimony to show that the sum so obtained was the exact money that was paid to appellant. The admission of the checks in evidence was not error when it was shown that the payment to appellant was from the proceeds thereof. *Taylor v. State*, 44 Ga. App. 387, 161 S. E. 793.

Neither Mr. England nor Mrs. Wickert was permitted to testify as to what the other said concerning the procuring of the money in question. Each testified as to what he personally did in connection therewith. This was direct, first-hand evidence and did not violate the hearsay rule.

■ The fifth and sixth assignments complain of the admission in evidence of three check register books of J. H. England Lumber Co., and assert that the testimony of Mrs. Wickert in reference to them, constituted error. Her testimony on the subject showed that she prepared the books, that they were kept in the regular course of business, and that entries were made therein near the time of the events in question. The check registers therefore were admissible under the provisions of RCW 5.44.110 (*cf.* Rem. Supp. 1947, § 1263-2), if relevant. They were relevant because, along with the other evidence, they tended to show that appellant actually received the money which the state charges was a bribe.

■ Appellant complains that the pencil notation "Sam" opposite the entry of the five-hundred-dollar payment noted as having been made on April 3, 1950, was self-serving and prejudicial, inasmuch as other notations made in the course of business were in ink. This objection might affect the reliability of the check register as a business record, but the statute referred to gives the trial judge a discretion as to the admissibility of such records. In the light of Mrs. Wickert's description of the method of keeping these records, we cannot find any abuse of discretion in admitting them. See *Choate v. Robertson*, 31 Wn. (2d) 118, 195 P. (2d) 630; *State v. Meyer*, 37 Wn. (2d) 759, 226 P. (2d) 204; *Morrison v. Nelson*, 38 Wn. (2d) 649, 231 P. (2d) 335.

An understanding of the seventh assignment requires a further statement of the evidence. During the presentation

of appellant's case, he offered in evidence a summons and complaint which had been filed in the United States district court in Tacoma on May 7, 1951. These documents showed that one Harvey Reynolds, a California real-estate broker, had instituted a suit against Mr. England and appellant. The complaint alleged two causes of action. The first stated that Mr. England had engaged Mr. Reynolds to sell his California timber on September 6, 1950, on a commission basis, that Mr. Reynolds had procured the Union Lumber Co. as a buyer, and that Mr. England had sold the timber two months later to that company for $365,000. The second cause of action alleged, on information and belief, that appellant and other brokers had conspired to induce Mr. England to breach this contract and to cause him to pay the commission on the sale to the coconspirators instead of to Mr. Reynolds.

A meeting was held by Mr. England and appellant and their respective counsel in June, 1951, to discuss their course of action in defending against this lawsuit.

On cross-examination of Mr. England and on direct examination of appellant and of his then attorney, appellant's counsel attempted to prove an oral statement made by Mr. England at this meeting in answer to a question directed to him by appellant's then attorney. Each time counsel for the state objected on the ground that the communication was privileged. These objections were sustained, and appellant's counsel made proper offers of proof in the absence of the jury.

The evidence showed that the purpose of the meeting was to determine, in so far as possible, why Mr. England and appellant had been made defendants in the Reynolds lawsuit and whether there was any substance to the lawsuit. Appellant offered to prove by the witnesses above mentioned that, during this conference, appellant evinced an attitude of ill-will toward Mr. England and that:

"Mr. Armstrong, Mr. England's attorney, looked toward Mr. Emmanuel and in substance stated, 'Well, you and Mr. England have settled your claim against Mr. England, haven't you?' In answer thereto Mr. Emmanuel said, 'Yes, we have,' and Mr. England either acquiesced in that statement by silence or said, 'Yes it has been taken care of.'"

RCW 5.60.060 (2) (*cf.* Rem. Rev. Stat., § 1214(2)) provides:

"An attorney shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment."

 The same privilege accorded the attorney is extended to the client under the common-law rule. *State v. Ingels,* 4 Wn. (2d) 676, 104 P. (2d) 944. (Certiorari denied. 311 U. S. 708, 85 L. Ed. 460, 61 S. Ct. 318.) Such statutes are merely declaratory of the common law. 58 Am. Jur., Witnesses, § 463.

In support of this seventh assignment of error, appellant argues that (a) the alleged communication was not privileged because there was no communication between Mr. England and *his* then attorney and that there was no confidentiality in any event and (b) that, even assuming that the privilege existed, the state may not claim it.

 The conference involved in this case was not between opposing parties to litigation and their respective attorneys. The persons present at this conference had a mutual interest in defending against the allegations of Mr. Reynold's complaint. The meeting was held for a common purpose, and the communications made by either client in the presence of the attorneys were made for the purpose of obtaining legal advice in the preparation of their defense to this lawsuit. They were intended to be confidential at least as to third persons not present at the conference.

In *Hartness v. Brown,* 21 Wash. 655, 59 Pac. 491, where two persons having a common interest in certain pending litigation had a conference with the attorney representing one of them, it was held the communications between the attorney and the client were privileged and could not be shown by a third party. This holding was subsequently declared to be clearly right in *Halffman v. Halffman,* 113 Wash. 320, 194 Pac. 371.

Appellant cites 8 Wigmore on Evidence (3d ed.) 607, § 2312, as stating examples of the application of the rule in situations similar to the present case. These examples all

relate to opposing parties in a lawsuit who were present at the conference and do not apply to the situation where the dispute is between one of the parties to the conference and a third person not claiming under either. We hold that the alleged communication was privileged under the situation existing in the case at bar. *Baldwin v. Commissioner of Internal Revenue* (C.C.A. 9th), 125 F. (2d) 812, 141 A. L. R. 548, 564.

 As to appellant's second contention on this branch of the case, we think that respondent in this case was a third party who was not in a position to claim the privilege. This is in accord with our decision in *Martin v. Shaen,* 22 Wn. (2d) 505, 156 P. (2d) 681, where we said:

"The rule is well-nigh universal that the privilege against examination of a witness upon matters of confidential communication is personal to the client, patient, or other person to whom the privilege is extended. 70 C. J. 456, Witnesses, § 619. Such is the rule in this state. *McCarthy v. McCarthy,* 116 Wash. 360, 199 Pac. 733; *Williamson v. Williamson,* 183 Wash. 71, 48 P. (2d) 588 [Affirmed on rehearing, 185 Wash. 707, 54 P. (2d) 1215]; *State v. McGinty,* 14 Wn. (2d) 71, 126 P. (2d) 1086."

In *State v. Dunkley,* 85 Utah 546, 39 P. (2d) 1097 (overruled on other grounds in *State v. Crank,* 105 Utah 332, 142 P. (2d) 178, 170 A. L. R. 542) and in *State v. Madden,* 161 Minn. 132, 201 N. W. 297, the prosecuting witness was cross-examined by defendant's counsel as to privileged matters. The state objected, claiming the privilege. In each case, the objection was overruled, and the appellate court in affirming the trial court held that the privilege was that of the prosecuting witness and could not be claimed by the state.

We, therefore, find that the privilege was claimed by a party who was not entitled to claim it. The offered testimony should have been admitted. Failure to do so was prejudicial error, since it was material to the vital issue under count III, to wit, whether the five-thousand-dollar payment was made in settlement of appellant's claim or was a bribe or partly for each purpose.

The remaining assignments of error relate to instructions given by the court or to its refusal to give instructions re-

quested by appellant. We have carefully examined all the instructions given by the court, appellant's exceptions thereto as well as his proposed instructions but find it necessary to discuss only assignments No. 8, No. 9 and No. 15.

The first two of these assignments are directed to instructions No. 4 and No. 5 and the court's failure to give three requested instructions.

In No. 4, the court defined the crime of bribery in general terms and in No. 5, told the jury that in order to convict appellant of that crime the state must prove to them beyond a reasonable doubt all of the elements of the crime stated therein. Four separately numbered paragraphs are set forth purporting to include all the essential elements of the crime.

Appellant complains because instruction No. 5 omits any reference to the following allegation contained in the information:

". . . which said applications for said extensions were then pending before the Commissioner of Public Lands of the State of Washington. . . ."

Respondent argues that this allegation was mere surplusage, and that the element of the pendency of the applications for extensions before the commissioner of public lands is not an essential element of the crime. We are of the opinion that it was an essential element.

RCW 9.18.020, defining the crime of bribery, provides in part:

"Every executive or administrative officer or person elected or appointed to an executive or administrative office who asks or receives directly or indirectly, any compensation, gratuity, or reward, or any promise thereof, upon an agreement or understanding that his vote, opinion, or action upon any matter then pending, or which may by law be brought before him in his official capacity, shall be influenced thereby; . . ."

In *State v. Hart,* 136 Wash. 278, 239 Pac. 834, a former governor was charged under this statute with requesting the liquidator of a bank and his attorneys to seek additional fees for their services over and above those actually earned upon an understanding that such money was to be paid to the

governor. This action was alleged in the information to be in violation of the governor's official duty. In holding that the information did not charge a crime, this court said:

"Comparing the allegations of the information with the provisions of the statute, it is at once apparent that it falls far short of stating any act which constitutes a violation of 'this clause of the statute. While it is alleged that the defendant asked the liquidator of the insolvent bank named and the attorneys of the liquidator to add a certain sum of money to their fees as such liquidator and attorneys, and pay the money over to him, *it is not alleged that the matter of fixing the fees of these officers was then pending before him, or that it might by law be brought before him,* or that there was any agreement or understanding that his vote, opinion or action in the matter should be influenced by the promise of such payment. *These are essential elements of the crime denounced by the statute,* and *without an allegation in some form that the matter was pending before him,* or that it might be brought before him in his official capacity, and that there was an agreement or understanding that his vote, opinion or action thereon should be . influenced thereby, *plainly no crime is stated.*" (Italics ours.)

This decision was quoted with approval in *State v. Whetstone,* 30 Wn. (2d) 301, at page 308, 191 P. (2d) 818. It was again recognized that, under RCW 9.18.020, it was necessary that the information allege the pendency of the particular matter before the executive or administrative officer in order to charge the crime of bribery.

In the present case, the trial court in instruction No. 5 charged the jury as follows:

"You are instructed in order to convict the defendant of the crime of bribery as to any of the counts charged in the Information herein, the State must prove to you beyond a reasonable doubt all of the following elements of the crime.

"(1) That on or about the date charged in the Information, to-wit, October 6, 1949 as to Count 1, March 30, 1950 as to Count 2, and April 13, 1951 as to Count 3, that the defendant, Samuel Emmanuel directly or indirectly did ask or receive from the witness, J. H. England, compensation, gratuity, or reward upon an understanding or agreement that the said defendant's judgment, action, or decision with relation to the applications of J. H. England for extensions of

the expiration dates of timber bills of sale number 3332 and 3707 would be influenced thereby.

"(2) That said timber bills of sale were contracts for the sale by the State of Washington and the purchase and removal by the said J. H. England of standing timber upon lands belonging to the State of Washington.

"(3) That at the time of such asking or receiving, if in fact, the defendant did so ask or receive, the defendant was then employed by, or acting for, the State of Washington or for any public officer thereof,

"(4) That said acts occurred in Lewis County, Washington."

 It is not a sufficient answer to this assignment of error to say that the jury could have supplied the omission of this element (pendency of the applications before the land office) by reference to the other instructions. Concededly, as a general legal principle all the pertinent law need not be incorporated in one instruction. However, the trial court undertook to specifically tell the jury in instruction No. 5 that they could convict appellant if they found that four certain elements of the crime had been proven beyond a reasonable doubt. In effect, the judge furnished a yardstick by which the jury were to measure the evidence in determining appellant's guilt or innocence of the crime charged. The jury had a right to regard instruction No. 5 as being a complete statement of the elements of the crime charged. This instruction purported to contain all essential elements, and the jury were not required to search the other instructions to see if another element alleged in the information should have been added to those specified in instruction No. 5.

This court, sitting *En Banc,* granted a new trial in *State v. Hilsinger,* 167 Wash. 427, 9 P. (2d) 357, because of the failure of the trial court to include in an instruction all pertinent elements contained in the statute under which the defendant was prosecuted, saying:

"Respondent argues that the error in the instruction quoted was harmless, because the trial court, in a subsequent instruction, told the jury that the homicide, unless excusable or justifiable, constituted murder in the second degree, if they found beyond a reasonable doubt the presence of cer-

tain elements of that crime, which were defined by the court; and that, if the jury should find from all of the evidence that the state had proven beyond a reasonable doubt the existence of each of such elements of the crime of murder in the second degree, it would be the duty of the jury to return a verdict of guilty, unless they should further find that the killing was justifiable, or that, at the time of the killing, the defendant was insane or mentally irresponsible. Respondent also relies upon the instruction which the court gave defining justifiable homicide.

"The decision of this court in the case of *State v. Rader, supra* [118 Wash. 198], is controlling here. Appellant excepted to the giving of the instruction defining murder in the second degree, on the express ground that the same omitted the words 'excusable or justifiable,' and in her exception referred to the *Rader* case as an authority. In the case at bar, as in the case cited, the homicide was admitted, the accused contending that it was justifiable. The instruction defining justifiable homicide, given by the trial court in the case at bar, is practically identical with that given in the case of *State v. Rader*, and, under the holding in the latter case that the appellant therein 'was entitled to have the element of justification called to the attention of the jury in its definitions of the degree of murder,' it must be held that the trial court, in the case at bar, committed reversible error in leaving out of its instruction defining murder in the second degree the elements of excuse or justification.

"*In instructing a jury as to the statutory definition of the crime with which a defendant stands charged, all of the pertinent elements contained in the statute should be set forth.* The instruction here complained of was certainly unfair to the appellant, and we are not inclined to overrule the prior decision of this court to the effect that the error cannot be cured by subsequent instructions such as were here given." (Italics ours.)

That this rule is applied generally in the United States is shown in the recent decision of the supreme court of Wyoming in *State v. Parmely,* 65 Wyo. 215, 199 P. (2d) 112, where the authorities are discussed. The following quotation in that opinion from *Croft v. State,* 117 Fla. 832, 158 So. 454, is pertinent here:

"Where the trial court attempts to define the offense, for the commission of which an accused is being tried, it is the duty of the court to instruct the jury as to each and every

essential element of the offense charged and a charge attempting to define the offense which does not cover material elements of the offense is necessarily misleading and prejudicial to the accused. It is equivalent to directing the jury that it is not necessary for the state to prove any elements of the offense except those included in the definition by the court.

" 'To have the advantage of this right it is not necessary for the accused to request special charges covering the elements of the offense which have not been covered by the charge embraced in the definition given to the jury by the court of its own volition because, . . . it is the duty of the court to define to the jury the elements of the offense with which the accused is charged and such definition must be at least not misleading.' "

In instruction No. 5, no mention was made of the pendency of the applications for extensions before the commissioner of public lands. Appellant was entitled to have this element included in any instruction purporting to define the essential elements of the crime for which he was being tried. He requested an instruction which included this element (No. 14) and excepted to the court's refusal to give it as well as to the failure to include this element in No. 5 quoted above. Whether requested instruction No. 14 otherwise correctly stated the applicable law, we need not determine. We are compelled upon the authority of the cases cited herein to hold that the omission of this element from No. 5 was prejudicial error.

Appellant in assignment No. 15 complains of the refusal of the court to give a requested instruction that Mr. England was an accomplice and that the jury should carefully examine his testimony in that light. There was no error in refusing to give this proposed instruction.

The test in this state as to whether a witness is an accomplice or not is whether he could be indicted for the same crime for which the defendant is being tried. *State v. Wappenstein,* 67 Wash. 502, 121 Pac. 989; *State v. Morrison,* 175 Wash. 656, 27 P. (2d) 1065. Mr. England had neither asked nor received a bribe and thus could not have been indicted under the statute involved. In discussing the rule of the

*Wappenstein* case, *supra,* this court in the *Morrison* case said:

"It is clearly held, also, in the case just cited that the bribe-giver is not an accomplice, but is guilty of a distinct and separate offense. Hence, under the authority of that case, there was no error in the refusal to give the cautionary instruction which was here requested."

Because of the above-mentioned error in instruction No. 5, we are constrained to reverse the judgment of the trial court as to all three counts. Regarding count III, the trial court also committed reversible error in excluding the offered testimony relative to the privileged communication of Mr. England at the June, 1951, conference.

For these reasons, the cause is remanded to the trial court with directions to grant appellant a new trial on each of the three counts charged in the information.

GRADY, C. J., MALLERY, SCHWELLENBACH, and HAMLEY, JJ., concur.

OLSON, J. (dissenting)—I cannot agree with the conclusion of the majority upon instruction No. 5, quoted in the opinion.

Considered alone, this instruction specifically charges the jury that to convict it must find that the action of defendant which was to be influenced by the payment, was his action upon applications for extension of two numbered timber bills of sale. These were in evidence and no others were before the jury. No juror could have had any doubt about the applications for the extension of these specific timber contracts being a pending matter.

All of the law cannot be stated in one instruction. Several specific instructions refer to the burden upon the state to prove that defendant asked for money upon the understanding that his actions within his official capacity as an employee of the state, in the conduct of the business of the state, would be influenced. Other instructions adequately cover the matters urged in defense.

The instructions, considered together as the jury was bound to consider them, cannot mean or be taken to refer to other than current pending business of the state.

Perhaps the questioned instruction could have been phrased more aptly. Its form is not approved necessarily. But, in my opinion, it sufficiently defined the requirements of the state's proof, and, in any event, defendant could not have been prejudiced by it.

The judgment on the verdict on counts I and II should be affirmed.

WEAVER, J., concurs with OLSON, J.

FINLEY, J. (concurring in the granting of a new trial but dissenting in part)—I agree with the majority that the language of instruction No. 5 was not adequate to apprise the jury, clearly and precisely, of one of the essential elements of the crime charged; furthermore, that the state had no right to assert the claim of privilege respecting a communication which purportedly took place at a conference between Mr. England and Mr. Emmanuel, and their respective attorneys, relative to a lawsuit in Federal court in which England and Emmanuel were defendants. I disagree with the view of the majority that the purported communication was confidential, and with the inference that follows therefrom that either Mr. England or his attorney may have the right to assert privilege resulting in the exclusion of testimony regarding the purported communication.

The claim of privilege by an attorney may rest upon the statute (RCW 5.60.060 (2)) or upon common-law principles, since the statute is said to be declaratory of the latter. A claim of privilege by a client called as a witness rests only upon common-law principles. This seems clear, upon examination of the language of the statute, which reads:

"An attorney shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment."

Absent the factor of confidentiality, neither the statute nor the common law will support the claim of privilege and an exclusion of evidence based thereon.

The reasoning of the majority is that, at the conference, Messrs. England and Emmanuel were not opposing parties

in a lawsuit and, consequently, that the situation is not one where a communication would be unprivileged because of the adverse interests of the parties. However, in the lawsuit in Federal court which occasioned the conference between Messrs. England and Emmanuel and their respective attorneys, the second cause of action alleged on information and belief that appellant Emmanuel and other brokers had conspired to induce Mr. England to breach a contract to pay a commission to a California real-estate broker, and to pay the commission to Mr. Emmanuel and his coconspirators. It seems to me that the majority goes too far in assuming that the interests of Messrs. England and Emmanuel were mutual, that their interests were not diverse, in regard to the second cause of action. The contrary seems more likely to me and that, as opposing parties with diverse interests, it should follow that confidentiality was lacking with respect to the communication which purportedly took place at the conference, and that the claim of privileged communication may not be validly urged, under the circumstances, either by Mr. England or his attorney.

I think another fact negatives confidentiality, namely, the presence of Mr. Emmanuel's attorney at the conference. The record does not show that he was retained by, or that he was under any professional obligation to, Mr. England. No attorney-client relationship existed between them. Emmanuel's attorney was a free agent, or perhaps even a stranger, in so far as Mr. England was concerned. This certainly appears to me to be not wholly consistent with the thought that the conference was secret and confidential. (Compare *Smale v. United States*, 3 F. (2d) 101, where a statement made by one defendant to the attorney for a codefendant was held not to be privileged.) It is my feeling that the parties were dealing at arm's length—each represented by his own competent counsel. I believe it is just as logical to say that their purpose was one-sided, and that they were motivated by self-interest, as it is to say that they met to negotiate a mutual security pact as to common or identical interests.

Finally, I think a clear-cut distinction must be made as to Mr. Emmanuel's attorney. If he is called as a witness at the new trial, RCW 5.60.060 (2) would not be a restraint upon his testifying as to matters which occurred at the conference; furthermore, the same can be said of common-law principles. This is for the simple reason that no attorney-client relationship existed as between England and Emmanuel's attorney. As a practical matter, I cannot see how the question of privilege could be raised against testimony by Emmanuel's attorney, unless the trial court would permit Mr. England (present in court only as a spectator or as a witness) to arise, interrupt the proceedings, and assert privilege, requiring exclusion of the questioned confidential communication. This would be an unusual, as well as a somewhat surprising, procedure, to say the least.

VIII Wigmore on Evidence (3d. ed.) 547, § 2290 *et seq.*, indicates that the rule regarding the confidential nature of communications between attorney and client has been adhered to by the courts for several centuries. Despite this, and the fact that the rule is partly based upon statute in our state, it seems to me that some reconsideration and qualification regarding the rule may well be in order, both by the courts and the legislature. Originally, the rule was justified on the theory that an attorney's code of honor prevented him from revealing secrets of his client. The attorney and not the client could raise the question of the privileged nature of attorney-client communications. In the course of years, another justification for the rule was advanced, namely, that, as a matter of public policy, it was desirable for clients to feel secure in divulging information to their attorneys. Under the latter rationale, either the attorney or the client could raise the question of privilege and avoid questioning as to confidential communications. It is difficult for me to accept as logical the justification or theory that the rule encourages clients to divulge information to their attorneys, because very few clients have any idea that such a rule exists; furthermore, if secrecy and protection of a client is the principal justification for the rule, its objective is almost wholly defeated in situations like

the instant case by permitting an offer of proof to be made, indicating that a conference took place and that certain statements, purportedly, were made at the conference, and that the facts as to a conference and statements made could be established by testimony if the rule of privilege was not enforced by the trial court. After such an offer of proof is made, there is no secrecy or confidentiality except in so far as a particular jury of twelve individuals may be concerned. Except for the members of a particular jury, the offer of proof, alleging that a conference took place and that certain statements were made, becomes public information. Secrecy, confidentiality, and protection of a purported client ceased to exist as a practical matter after the offer of proof was made.

I agree with the views of the majority, except as indicated hereinbefore.

HILL, J., did not participate.

---

September 10, 1953. Petition for rehearing denied.