[Nos. 29927, 29928. Department One. October 3, 1946.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN HENRY CLARK *et al., Appellants.*[1]

[1]Reported in 173 P. (2d) 189.

*Will Lanning* and *Bill Lanning,* for appellants.

*Lloyd Shorett, J. Edmund Quigley,* and *Herbert H. Davis,* for respondent.

SCHWELLENBACH, J.—The defendants were charged with first-degree murder, as follows:

"They, the said JOHN HENRY CLARK and ANNIE CLARK, and each of them, in the County of King, State of Washington, on or about the 26th day of October, 1945, with a premeditated design to effect the death of one Sam Katz, a human being, and while then and there engaged in the commission of the crime of Larceny, or in attempting to commit the crime of Larceny, wilfully, unlawfully and feloniously did strike, beat, cut and wound the said Sam Katz, with an axe

and knife then and there held by the said JOHN HENRY CLARK, thereby mortally wounding the said Sam Katz, from which said wounds the said Sam Katz then and there died;

"Contrary to the statute in such case made and provided, and against the peace and dignity of the State of Washington."

Upon trial of the charge, the jury returned a verdict of murder in the first degree as to each of the defendants. From judgment and sentence entered as to each of them on the verdicts, both defendants have appealed.

The facts may be summarized as follows:

Sam Katz, aged seventy-six years, was the proprietor of a secondhand store located at 653 Jackson street, Seattle. He lived alone on a balcony at the back of the store. Anner Finkle was associated with him in the business. Finkle usually was in the store from nine in the morning until ten or eleven at night. On the evening of October 26, 1945, Katz seemed quite anxious for Finkle to leave—reminding him of the time on a couple of occasions. About eleven o'clock, Finkle left, Katz accompanying him to the front door and locking it by shoving a bolt through the hasps placed on the inside of the door.

Shortly after eight o'clock on the following morning, a young Negro, William Thomas, entered the store for the purpose of looking at an overcoat. The door was unlocked. No one came to wait on him. He slammed the door, turned on the radio, and played the phonograph, all for the purpose of raising someone. There being no response, he walked toward the rear of the store, where he saw a coat lying on the floor with blood dripping on it from above. He ran out, went to a nearby hotel and called the police.

Upon the arrival of the officers, they went to the rear of the store, where they observed the coat and the blood dripping from the balcony. They went up to the balcony, which Katz used as a bedroom, found the light burning, and saw the body of a man, clad only in an undershirt, lying on the floor, with a large wound on the top of his head. His left ear was black and bruised and there were cuts on his neck and throat. An autopsy revealed that the wound on

the head had been caused by the use of a blunt instrument, but which would not necessarily have resulted in death. The autopsy further disclosed that the man's throat had been cut—four separate strokes on the left side and seven on the right. The cuts had gone sufficiently deep, passing over the top of the Adam's apple, to sever the common carotid artery on the left side, also to sever the windpipe and the gullet. This caused death within a few minutes.

A double-bitted ax, with blood on one of the bits, was found resting against the wall near the lavatory. It was free of finger prints. A man's handkerchief was found in the lavatory bowl. The water in the sink was running full force on some books and a whisky bottle placed in the basin of the sink. The large door of the safe was ajar and the inner door unlocked. Several partially burned matches, as well as two .32-caliber pistol cartridges, were on the floor in front of the safe.

When Mr. Finkle arrived that morning, he identified the body as that of Sam Katz. He discovered that about seventeen hundred dollars, contained in a shoe box, as well as several revolvers, was missing from the safe. The money taken was in denominations of ten, twenty, and fifty-dollar bills and one one-hundred-dollar bill.

In the early part of November, 1945, Franklin Luster, a Negro, was arrested, and a black-handled revolver was found in his possession. This was identified as one of the revolvers taken from the safe the night Katz was murdered. When questioned by the police, Luster stated that he had gotten it from John Henry Clark. He then took the police to the Clark residence, and Clark and his wife were placed under arrest.

Thomas Collins, a taxicab driver in Bremerton, identified the appellants as a couple he had picked up as "fares" in Bremerton on October 31, 1945, and took to Tacoma in search of a used car. At an automobile agency there, they bought a Buick car for fifteen hundred dollars, plus the tax, paying therefor in cash—mostly in ten and twenty-dollar bills, some fifties, and one one-hundred-dollar bill. They

then followed Collins back to Bremerton, paying him forty-five dollars for the trip and giving him a ten-dollar tip.

Annie Clark had purchased a watch from Finkle in July or August of 1945 for twenty-five dollars, making a five-dollar deposit and paying the balance a week later. On October 16, 1945, she pawned this watch to Finkle for twelve dollars; and, on October 23rd, she asked Katz and Finkle to hold the watch for another week until her husband received his check.

On October 24, 1945, she and her husband came into the store. She stopped to look at some jewelry. He went to the back of the store, ostensibly to look at a raincoat. The coats were located near the safe. About ten o'clock on the evening before Katz was killed, Finkle had gone out to a restaurant next door, and saw both appellants standing in the doorway of the Evergreen hotel, located on the second and third floors of the same building where the store was.

This comprises the evidence, with the exception of certain admissions made by the appellants which will be discussed later.

■ Appellants assign as error the giving of instruction No. 2:

"Under the laws of this State, the killing of a human being, unless it is excusable or justifiable, is MURDER IN THE FIRST DEGREE when committed with or without a design to effect death by a person engaged in an attempt to commit the crime of Larceny.

"You are further instructed that when one is charged with MURDER IN THE FIRST DEGREE in killing a human being while engaged in the commission of the crime of Larceny, it is not necessary for the State to show any premeditation or design to effect the death of the person killed by the person doing the killing."

It is claimed that this instruction was erroneous as to appellant Annie Clark, for the reason that there was no testimony that she had attempted to, or did, commit the crime of larceny or had "a premeditated design to effect the death of one Sam Katz."

Annie Clark was being tried as an accessory. Rem. Rev. Stat., § 2260 [P.P.C. § 112-13], makes an accessory a principal.

■ Error is claimed in the giving of instruction No. 10, which reads as follows:

"To convict the defendant ANNIE CLARK of the crime of Murder in the First Degree, the State must have satisfied you from the evidence beyond a reasonable doubt of all of the following elements: (1) That the defendant JOHN HENRY CLARK, on or about the 26th day of October, 1945, while engaged in the commission of the crime of Larceny, or in attempting to commit the crime of Larceny, did strike, beat, cut and wound Sam Katz with an axe and knife; (2) That this act was done with a premeditated design to effect the death of Sam Katz; (3) That as a result of wounds so inflicted, said Sam Katz died on October 26, 1945; (4-a) That the defendant ANNIE CLARK acted in concert with the defendant JOHN HENRY CLARK in the killing of said Sam Katz, or (4-b) That the defendant ANNIE CLARK, not being present, directly or indirectly aided, assisted, abetted, advised, encouraged or counselled the said killing of the said Sam Katz; (5) That Sam Katz was so killed in King County, State of Washington.

"If you find from all the evidence admitted in this case that the State has, as to the defendant ANNIE CLARK, proved beyond a reasonable doubt elements (1), (2), (3) and (5) and, in addition thereto, EITHER (4-a) or (4-b), then it will be your duty to return a verdict of Guilty of Murder in the First Degree, as to such defendant."

Objection is made to subds. (4-a) and (4-b) of the instruction, because they were given in the alternate. They correctly stated the law. Subds. (4-a) and (4-b) could have been joined in one subdivision. The method used assisted and clarified the matter for the jury.

■ Another assignment of error is the giving of instruction No. 13, as follows:

"I instruct you that before a homicide can be held excusable, four elements must be present: First, the homicide must have been commited by accident or misfortune; second, it must have occurred in the doing of a lawful act by lawful means; third, ordinary caution must have been observed by the person responsible for the killing; and fourth,

this person must have acted without any unlawful intent. If any one of these four elements be eliminated from the factual situation, the homicide is not excusable within the meaning of the law."

It is true that no evidence was introduced which would warrant giving an instruction covering excusable homicide. But this was not prejudicial to the appellants—it was to their benefit.

A more serious question arises over the testimony of a police officer as to certain admissions made by the appellants while they were in custody.

Immediately upon their arrest on November 13, 1945, the appellants were brought before Detective Captain Richard F. Mahoney. They were questioned a few minutes and then taken to the secondhand store, where they were identified by Finkle. Upon their return, he questioned them many times—sometimes separately, sometimes together. At times, they were permitted to talk to each other privately. At first, they both denied any knowledge of the crime or of any acquaintanceship with Katz. Then, at various times, they were confronted with the witness Luster, who got the pistol from Clark, and with the landlord of the hotel where they lived. Finally, on November 14, 1945, after talking with Clark five or six times and with Mrs. Clark six or seven times, each statement conflicting with previous statements, the appellants made the admissions which Captain Mahoney testified to in court.

Timely objections were made to the introduction of this evidence. Thereupon, the trial court made the following ruling:

"I think the confessions or any statements shall have to be confined to the statement that each defendant makes as involving himself or herself, and no statement shall be made or evidence offered, and I think you will have to be very careful about that, as to what part the other defendant had, if any. So that whatever evidence is introduced in this matter will have to be introduced as against the defendant that makes it, and that defendant only. Now, whether you can draw that line here or not is perhaps a debatable question."

This ruling was scrupulously followed by the prosecutor and the witness.

Captain Mahoney then testified as follows as to the statement made by Clark on November 14th:

"A. He said that he had gone to the Sam Katz establishment, the second-hand store; that he was admitted; that he went upstairs; that Sam Katz was sitting on the side of the bed, and that he said, 'Let's have a drink, we are all friends'; that he said, 'I don't wish a drink' or 'I don't want a drink'; that he took the axe, he took a double-bitted axe; he identified the axe as one that we found in the lavatory of the establishment, and that he hit Katz on the side of the head with the axe, with the blunt side of the axe. Q. How many times did he say he had hit him? A. He said he struck him twice. Q. And then what did he tell you? A. That he had fallen—that Katz fell on his face, and that he had gone downstairs and taken the money from the safe; that he came back upstairs, and that for reasons that he explained he had cut Katz' throat with a pocket knife. Q. Now, what reason did he give you for cutting the throat? A. He didn't want Katz to later identify him and tell on him."

Mahoney also testified that he had found three pistols in the Clark home "down along the back or side of an overstuffed chair there was a slit along where the roll of the overstuffed chair is made, and back down in the back part of the chair I found those guns"; that, before going there, Clark had told him where the pistols were, and that Clark admitted getting them from the safe after he had murdered Katz; that it was money taken from the safe with which he purchased the car; that he gave a pistol taken from the safe to Franklin Luster; that he cut the throat of Katz by using the small brown pocket knife that later was taken from him by the jailer after he had been arrested, and that, as Katz lay on his face on the floor, he reached down and cut his throat; that, at the time he entered the store, he had not contemplated murdering Katz, but, after the robbery, and realizing that Katz would know him and identify him, he decided that it was best to kill him.

Captain Mahoney testified that the following statement was made to him by Annie Clark on November 14th:

"She told me at that time that she had gone to the establishment of Sam Katz; that she was admitted by Katz; that she had previously made a date or an appointment with Katz at his second-hand store; that after being admitted they went to the balcony, which was Katz' bedroom; that after an act of intercourse she had gone downstairs; she had gone to the front door. She later went back upstairs and she held matches in front of the safe. She had assisted in lighting matches."

■ Rem. Rev. Stat., § 1214 [P.P.C. § 38-9], reads in part:

"The following persons shall not be examined as witnesses: —

"1. A husband shall not be examined for or against his wife without the consent of the wife, nor a wife for or against her husband without the consent of the husband; nor shall either, during marriage or afterwards, without the consent of the other, be examined as to any communication made by one to the other during marriage. But this exception shall not apply to a civil action or proceeding by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other; . . ."

The statute means just what it says. No spouse shall be examined as a witness for or against the other spouse without the consent of such spouse. *State v. Kephart,* 56 Wash. 561, 106 Pac. 165, 26 L. R. A. (N.S.) 1123; *State v. McGinty,* 14 Wn. (2d) 71, 126 P. (2d) 1086.

■ We do not believe that it is proper to permit a third person to relate a statement made by one spouse against the other which that spouse would not be allowed to relate if called as a witness. Testimony should not be permitted to enter through the back door which the statute forbids to enter through the front door. *State v. Winnett,* 48 Wash. 93, 92 Pac. 904.

■ However, the privilege granted under the statute may be waived. It is personal to the persons designated by the terms of the statute, and they may expressly or impliedly waive their right to exclude the banned evidence. *State v. Frye,* 45 Wash. 645, 89 Pac. 170; *Williamson v. Williamson,* 183 Wash. 71, 48 P. (2d) 588; *State v. McGinty, supra.* In the *Williamson* case we said:

"As stated in 70 C. J., at page 380, such a statute
" ' . . . merely confers the privilege of refusing to testify as to such communications and of having them excluded; . . . The prohibition arises only when the spouse in whose favor the privilege exists demands by timely objection to the testimony that the privilege be enforced.' "

It is true that objection was made at the time of trial to the introduction of the evidence. But the consent to the admissions made to Captain Mahoney had already been given by both parties. They did not have to make these admissions, but they did. By doing so, they waived their right to object to the testimony concerning these statements being admitted at the time of trial. We are satisfied from the evidence that the statements to the officer were freely and voluntarily given by each of the appellants without any force or abuse, and that the statement of each appellant was given with the knowledge and consent of the other.

Furthermore, there is a very serious doubt in our minds whether the statement of either appellant implicated the other. We find nothing in the statement of the husband involving the wife. The wife stated that, after the act of intercourse, she went down to the front door. Obviously that was to let her husband in. She then said that she later went back upstairs, and that she held matches in front of the safe; that she had assisted in lighting the matches. That was the time her husband was ransacking the safe. But it must be remembered that, when she made the statement, she was being held under a charge as an accessory and that every part of her statement was relevant to that charge. The husband gave his statement first, and we fail to see where these two matters related by her were, under the circumstances, detrimental to him. Were the evidence of Clark's guilt slight or not compatible with his innocence and we would have to search for reasons to account for the verdict as to him, it might be that we would inquire as to the possible effect of the evidence under consideration. However, we do not see how the jury could have arrived at any other conclusion as to the appellant John Henry

Clark. *State v. Clark,* 156 Wash. 47, 286 Pac. 69, 85 A. L. R. 502.

■ Both appellants went on the witness stand and denied making the statements testified to by Captain Mahoney. But we find from all the evidence and the exhibits introduced (the pistols were all admitted without objection) that the jury was justified in arriving at the verdicts which it did.

We find no error in the record, and the judgment and sentence as to each appellant is therefore affirmed.

BEALS, C. J., ROBINSON, and JEFFERS, JJ., concur.

MILLARD, J., (dissenting)—I dissent. The appellants are entitled to a new trial. To admit testimony at the trial by the officers as to the admissions of the spouses is to render nugatory the statutory provision that no spouse shall be examined as a witness for or against the other spouse without the consent of such spouse. While appellants committed a most atrocious crime, they are entitled to the statutory (Rem. Rev. Stat., § 1214) safeguard. However heinous the offense, the rights and privileges of an accused should not be contravened.

■

November 18, 1946. Petition for rehearing denied.