[No. 33583. *En Banc.* March 7, 1958.]

CURTIS T. SWEARINGEN, *Respondent,* v. LEONARD VIK, *Appellant.*[1]

[1]Reported in 322 P. (2d) 876.

*Thomas B. Gess, James Leavy,* and *Duane E. Taber,* for appellant.

*Critchlow & Williams,* for respondent.

FINLEY, J.—This is an action for alienation of affections, instituted by plaintiff Swearingen against defendant Vik.

The complaint alleged that the defendant Vik, knowingly and willfully, induced Mrs. Swearingen to keep company with him and to join him on trips; that on such occasions he consorted with her in an improper and unlawful manner;

that, as a result, Mrs. Swearingen divorced plaintiff-husband; that he has been damaged by defendant, because of the loss of his wife's affections, in the sum of thirty-five thousand dollars. These allegations were denied by the defendant. After trial, the jury returned a verdict against the defendant in the sum of four thousand two hundred dollars. He has appealed.

Although there is an unusually sharp conflict in the evidence, the jury could have found the following facts: Swearingen and his wife were married on July 13, 1949. They both worked on the Hanford project and lived in Richland. On the whole, they were happy together, but their marriage was not without some disagreements. They once went to see an attorney about a divorce, but went home and forgot about it.

Swearingen contracted pulmonary tuberculosis and went to a hospital in Selah on May 28, 1952. He was there for about six weeks. His wife went to see him every Sunday, took him magazines, and was "very gracious and loving." Later, he was transferred to the Veteran's Hospital at Walla Walla, and his wife continued to visit him almost every Sunday. However, early in 1953, her attitude seemed to change, and she did not go to see him so often and was not as affectionate as formerly. On two occasions when Swearingen went home for a visit, he found cigar ashes in the ashtray of the car. He did not smoke cigars, and his wife explained, upon his inquiry, that the ashes had been left by traveling salesmen.

Swearingen was discharged from the hospital on April 16, 1954. His wife went to bring him home. They commenced quarreling as they were driving back from the hospital. The quarrel reached such proportions that when they arrived in town they went to an attorney's office, and she commenced a divorce action.

About a week later, Swearingen received a telephone call from a Mrs. Elizabeth Johnson, who persuaded him to drive with her past a house owned by appellant Vik. They saw Mrs. Swearingen's car in front of the house, parked alongside Mr. Vik's car. This was about nine o'clock in the eve-

ning. About an hour later, they returned to appellant Vik's house. The lights were out, and the cars were still there. Swearingen noted the same situation later during the same night and again on the following night.

About a month after that incident, Swearingen met Vik and told him: "Mr. Vik, I want you to leave my wife alone and quit running after her until she gets her divorce." Vik replied: "Nobody tells me who I can run around with." Vik then had respondent arrested for third degree assault.

One witness testified to having seen Vik and Mrs. Swearingen together at a company dance while Swearingen was still in the hospital; another, that he saw them driving together; and another witness said that he had seen them together at a restaurant, drinking beer, on the evening that the divorce action was commenced. Another witness testified that he had seen them together at a movie; another, to having seen them playing "blackjack" at Harold's in Reno; another, to having seen them both in the yard of the house owned by Vik, and to having seen Mrs. Swearingen in Vik's house; and still another testified to having seen them both carrying something out of that house to Vik's car. As heretofore stated, all of this testimony was sharply disputed. One thing that is clear from the record is that somebody lied. Apparently, the jury believed Swearingen's witnesses, and it returned a verdict against Vik.

■ We are satisfied that there was sufficient evidence, although it was all circumstantial, to go to the jury, and that the court did not err in denying appellant Vik's motion for judgment notwithstanding the verdict.

Appellant assigns error to the ruling of the trial court that Mrs. Swearingen could not testify as to confidential matters between herself and her husband, Mr. Swearingen. The ruling of the trial court, ostensibly, was based on RCW 5.60.060, the pertinent parts of which read:

"The following persons shall not be examined as witnesses:

"(1) A husband shall not be examined for or against his wife without the consent of the wife, nor a wife for or against her husband without the consent of the husband;

nor can either, during marriage or afterward, be without the consent of the other, examined as to any communication made by one to the other during marriage. But this exception shall not apply to a civil action or proceeding by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other."

In *State v. Thorne* (1953), 43 Wn. (2d) 47, 260 P. (2d) 331, this court had occasion to discuss the differences between the *two privileges* established by this statute:

"It must be noted that there are two distinct parts to this section of the statute. The first pertains to the marital privilege; it says, in effect, that no spouse shall be examined as a witness for or against the other spouse without the consent of such other spouse. *State v. Clark*, 26 Wn. (2d) 160, 173 P. (2d) 189 (1946). The second part sets out an entirely separate and distinct privilege relating to confidential communications; it says that neither spouse can ever, without the consent of the other, be examined as to confidential communications made by one to the other during the marriage. There is a substantial difference between these two privileges and the reasons for them which the courts have not always recognized. 8 Wigmore on Evidence (3d ed.) 638, § 2334; 5 Jones on Evidence (2d ed.) 4000, § 2128.

"The first of these, the privilege of one spouse against having the other testify, spreads its shelter over an existing marriage. While the privilege covers acts before marriage (*State v. McGinty*, 14 Wn. (2d) 71, 126 P. (2d) 1086 (1942)), it ceases upon divorce or death. The reason usually given for this privilege is that it fosters domestic harmony and prevents discord. 8 Wigmore on Evidence (3d ed.) 221, *et seq.*, §§ 2227, 2228; 5 Jones on Evidence (2d ed.) 4001, § 2128.

"The second, the privilege against having the husband or wife testify as to confidential communications between the two, rests upon an entirely different foundation. It endeavors to encourage between husband and wife that free interchange of confidences that is necessary for mutual understanding and trust. It is thought that the greatest benefits will flow from the relationship only if the spouse who confides in the other can do so without the fear that at some later time what has been said will rise up to haunt the speaker. As Jones puts it, the purpose is

" '. . . to keep inviolate those acts and confidences without which no two persons would wish to live in inti-

mate and constant relation as man and wife.' 5 Jones on Evidence (2d ed.) 4001, § 2128.

"In many cases, analogous factors may be seen between this privilege against the disclosure of confidential communications between husband and wife and those privileges surrounding the confidential communications between attorney-client, priest-penitent, and physician-patient. The privilege against divulgence of confidential communications survives death or divorce. It applies to all actually successful confidential communications made between spouses while they are husband and wife."

■ The privilege preventing a husband or wife from testifying as to confidential communications belongs to, or may be asserted by, the communicating spouse in each instance; the hearing or receiving spouse has no privilege and is not entitled to object unless the nature of the communication is such that his or her silence can be construed as an assent to, and adoption of, the statement. 8 Wigmore on Evidence (2d ed.) 658-659, § 2340.

"(2) The spouse possessing the privilege may of course *waive* it. The waiver may be found in some extrajudicial disclosure, or in some act of testimony which in fairness places the person in a position not to object consistently to further disclosure." (p. 659)

■■ In the instant case, Swearingen was entitled to claim no privilege as to Mrs. Swearingen's own feelings, attitudes, communications, and acts during the marriage. It was error to exclude her testimony on these points. In addition, through his own divulgence on the witness stand of his *communications to his wife*, Swearingen must be held to have waived his privilege as to those communications; accordingly, it was error to deny the appellant the opportunity to impeach respondent's testimony as to the content of those communications through the testimony of Mrs. Swearingen.

Appellant asserts that respondent's attorney committed deliberate prejudicial misconduct when questioning the witness, Mrs. Elizabeth Johnson. Appellant assigns error to the trial judge's refusal to grant a mistrial at that point. Mrs. Johnson testified that she had been living with appel-

lant without benefit of a marriage ceremony; that, in April, 1954, appellant tore the bed clothes off her and told her to move out; that appellant said he was moving his girl friend in.

With considerable candor, respondent concedes that the evidence might be prejudicial to appellant. However, respondent contends that this is a result of appellant's general *modus operandi*, and that appellant should have perceived its prejudicial effect a bit earlier than at this trial. Respondent contends that the evidence is relevant to the issue in this case. It is his position that he succeeded in showing that Mrs. Swearingen is the *girl friend* who moved in after appellant moved Mrs. Johnson out. The trial court admitted the evidence for what it was worth and properly instructed the jury as to its probative value. In his discretion, the trial judge denied the motion for a mistrial. He apparently felt that respondent had established the relevancy of the evidence. An examination of the record is not convincing of any abuse of discretion by the trial judge.

Appellant's remaining assignments of error are directed to the giving of certain instructions to the jury and the failure to give offered instructions. Appellant's offered instructions are not correct statements of the law; the trial judge properly refused to give them.

The primary complaint of appellant with respect to the instructions given by the trial judge stems from the use of the term *inherently wrong* and the fact that it was, allegedly, paraded before the jury explicitly in two instructions and inferentially in a third. In effect, the instructions told the jury that if the respondent proved acts by the appellant which were *inherently wrong*, its verdict should be for the respondent.

This court clearly indicated in *Bernier v. Kochopulos* (1950), 37 Wn. (2d) 305, 223 P. (2d) 205, that *inherently wrongful* acts are not in and of themselves a sufficient basis for recovery in a suit for alienation of affections. There must be some causal connection between

the acts and the effect; *i.e.,* alienation of affections—and the evidence must indicate that the alienated spouse was not the pursuer. Although alienation of affections is an intentional tort, the law does not require that the plaintiff prove that the defendant had an *actual intent* to alienate the affections of plaintiff's spouse. *Eklund v. Hackett* (1919), 106 Wash. 287, 179 Pac. 803. In the eyes of the law, a man intends the natural and probable consequences of his acts; a person's intent to alienate the affections of another's spouse can therefore be inferred from a course of conduct. *Eklund v. Hackett, supra; Lankford v. Tombari* (1950), 35 Wn. (2d) 412, 213 P. (2d) 627, 19 A. L. R. (2d) 462. It is not necessary for a plaintiff to prove that the defendant's course of conduct was *the sole* causal factor in the alienation of his spouse's affection; it is sufficient if he proves that the defendant's course of conduct was *a* causal factor. *Lankford v. Tombari, supra.*

██ ██ A defendant may introduce evidence that the plaintiff's spouse had little affection for the plaintiff, but this is not a bar to the action. The probative value of such evidence relates solely to the question of damages. *Morris v. Warwick* (1906), 42 Wash. 480, 85 Pac. 42. A person consorts with another's spouse at his peril, even after the spouses are separated, for the law recognizes a *right* to effect a reconciliation. One who interferes with that right can be subjected to liability in a suit for alienation of affections. *Morris v. Warwick, supra.*

It has been suggested that any course of conduct which naturally tends to interfere with the right to effect a reconciliation is *inherently wrongful*, and that the trial court referred to that right by the use of the italicized term. That may be true, but we should examine the instructions as they would be interpreted by a non-legally trained juror. The instructions as given did not define the term, *inherently wrongful*. Each juror was free to speculate as to its meaning and to assign to it such meaning and relevancy as his or her own predilections directed. To some of the jurors, no doubt, playing "blackjack" might be *inherently wrong-*

*ful;* to others, dancing with another's spouse might be *inherently wrongful.*

In the instant case, we believe the use of the term *inherently wrongful* was ambiguous and, hence, not a proper statement of the law, and that the resulting error was prejudicial to the appellant.

Instructions Nos. 3, 4, 5, and 8 are incorrect or misleading. They should be rephrased in accordance with the views expressed in this opinion. With respect to instruction No. 5, we wish to emphasize that the gist of the cause of action is alienation of affections, not transfer of affections.

For the reasons indicated, the judgment is reversed, and the case remanded for a new trial.

HILL, C. J., MALLERY, DONWORTH, WEAVER, ROSELLINI, OTT, and FOSTER, JJ., concur.