[No. 19918-8-I.   Division One.   August 10, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. CHARLES EDWARD WOOD, JR., *Appellant.*

*Lorne M. Grier,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Donna Wise, Deputy,* for respondent.

PEKELIS, J.—Charles E. Wood, Jr., was convicted of committing the crime of indecent liberties between the dates of January 1 and May 19, 1985, against J., a girl who turned 6 years old on March 4 of 1985. His sole contention on appeal is that the trial court erred in allowing his wife to testify over his objection. The trial court ruled that Wood could not invoke the spousal testimony privilege because he was acting as the victim's "guardian," as that term is used in RCW 5.60.060(1), at the time the alleged crime occurred. We affirm.

I

Charles Wood and his wife Loretta lived next door to J. and her parents. J. began visiting the Woods regularly when she was approximately 4 or 5 years of age. During most visits she would play with Wood in their yard, but on at least two occasions she went inside the Woods' home. Wood described his relationship with her as that of "play partners." They did a great deal of active play, such as Wood's swinging J. around, playing horse, and giving J. piggyback rides. J.'s mother testified that J. "idolized" Wood and that she did not worry about J. in any way when J. was over at the Woods' home. J.'s mother testified that J.

had her permission to go to the Woods' house, and that it "was understood that if they didn't want the kids over that they would send them back home again."

J. testified that sometimes when Wood gave her piggyback rides, he touched her in her "privates" or her "potty." At these times she had her clothes on and "he would press [her] clothes up in with his fingers." It hurt her "[a] little bit." She remembers thinking at the time that it was an accident, and remembers that Wood told her he was sorry. She recalled that the incidents happened outside in the yard, and not in the house.

Wood testified that on two occasions, J. had complained when he had accidentally touched her vaginal area during piggyback rides. One of the incidents occurred on May 19, 1985. He had been playing outside with J. and decided to go inside to put on a long–sleeved shirt over his T–shirt. J. wanted to come inside and upstairs with him. He set her down outside the bedroom, and when he emerged, she asked for a piggyback ride down the stairs, jumped up on his back, and jerked his neck back. While getting her weight adjusted properly, J. "came down on [his] thumb." J. then said to him, "[d]on't put your finger in my potty." He replied, "J., no, we don't do that, no. We don't do that." The other incident was in 1984 and occurred during a piggyback ride when he jumped over a barrier in the yard and J. came down on his hand. He testified that neither accidental touching had been done for his sexual gratification.

Loretta testified that she overheard the conversation in the house on May 19, 1985, between Wood and J. Her testimony was that J. said, "[b]ut don't put your finger in my potty, because it hurts," and Wood replied, "No, we are not going to do that this time." Loretta testified further that approximately 1 week before hearing that conversation she had observed Wood having an erection while J. demonstrated a dance that she was going to do at school. Additionally, Loretta testified that she was "suspicious" of

Wood because of "all the other incidents that had happened in the last nine years."[1]

Prior to trial, Wood filed an objection to the State's calling Loretta as a witness. At a pretrial hearing, the court found that Wood was acting as a "guardian" when he was engaged in playing with J. and therefore Wood could not invoke the privilege against adverse spousal testimony under RCW 5.60.060(1).

## II

Wood contends that his "play partner" relationship with J. did not rise the the level of "guardian" so as to bar him from invoking the protections of the spousal testimony privilege. The State replies that Wood's physical play, the adoration of J. for him, and the trust placed in him by J.'s mother brought his relationship within the "guardian" definition.

RCW 5.60.060(1) prohibits a husband or wife from testifying against the other during their marriage without the consent of the nontestifying spouse. However, this rule of disqualification does not apply "to a criminal action or proceeding for a crime committed by said husband or wife against any child of whom said husband or wife is the parent or guardian". RCW 5.60.060(1).

A "parent" or "guardian" under RCW 5.60.060(1) includes "those who stand in the relationship of parent, or who assume duties normally characterized as parental even for a short time." (Citation omitted.) *State v. Bouchard*, 31 Wn. App. 381, 387, 639 P.2d 761, *review denied*, 97 Wn.2d 1021 (1982). Both terms, as used in this statute, have been broadly construed to mean any person who stands "in loco parentis." *State v. Waleczek*, 90 Wn.2d 746, 752, 585 P.2d

---

[1] J.'s mother's testimony was arguably corroborative of Loretta's and J.'s testimony against Wood. Prior to learning of Loretta's suspicions, J.'s mother had noticed changes in J.'s behavior, including misbehavior at school and resumption of bedwetting. She also noticed some vaginal rashes which disappeared after J. stopped playing with Wood, although the bedwetting continued. J. never spoke with her mother about any improper contact with Wood, but around a year later, J.'s mother overheard J. telling a friend about what had happened to her.

797 (1978). The accepted definition of a person in loco parentis is

> one who means to put himself in the situation of a lawful parent to the child with respect to the office and duty of making provision for it; one assuming the parental character and discharging parental duties; a person standing in loco parentis to a child is one who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation, without going through the formalities necessary to a legal adoption.

*Waleczek,* 90 Wn.2d at 752–53 (quoting 67 C.J.S. *Parent and Child* § 71 (1950)). The determination of whether a person is a guardian under RCW 5.60.060(1) will depend on the facts and circumstances of the case. *State v. McKinney,* 50 Wn. App. 56, 65, 747 P.2d 1113 (1987), *review denied,* 110 Wn.2d 1016 (1988).

The marital privileges are based on preserving the sanctity and harmony of marriage and were designed to avoid forcing the witness spouse to choose between perjury, contempt of court, or jeopardizing the marriage. *See The Marital Privileges in Washington Law: Spouse Testimony and Marital Communications,* 54 Wash. L. Rev. 65, 70 (1978). Since privileges are creatures of statute, however, they should be strictly construed. *Bouchard,* 31 Wn. App. at 387. Additionally, the privilege to bar a spouse's adverse testimony, particularly when no confidential communications are involved, is not highly favored by legal commentators. *See* 3 S. Gard, *Jones on Evidence* § 20:47 (6th ed. 1972); 2 J. Weinstein & M. Berger, *Evidence* § 505[02]–[04] (1986); *cf.* E. Cleary, *McCormick on Evidence* §§ 66, 86 (3d ed. 1984) (disfavoring *both* the marital disqualification and communications privileges); *compare* 8 J. Wigmore, *Evidence* § 2228 *with* § 2332 (1961). One commentator calls the spousal disqualification privilege "an archaic survival of a mystical religious dogma" under which a wife cannot be produced to testify either for or against her husband because they are "two souls in one flesh". E. Cleary § 66, at 162–63 & n.17.

Our own courts have recognized that in some situations the policies that underlie the right to invoke a testimonial privilege are outweighed by the suppression of truth that may result. *See State v. Thompson,* 88 Wn.2d 518, 524, 565 P.2d 315 (1977). In a recent case involving the issue of creating a parent–child testimonial privilege, our Supreme Court stated:

> Policy reasons against creating a parent–child privilege center on the loss of valuable evidence. We conclude that the loss of evidence concern outweighs the public policy arguments in favor of a parent–child privilege. We agree with the United States Supreme Court that excluding relevant evidence by creating a privilege is warranted only if the resulting public good transcends the normally predominant principle of using all rational means for ascertaining the truth.

*State v. Maxon,* 110 Wn.2d 564, 576, 756 P.2d 1297 (1988) (citing *Trammel v. United States,* 445 U.S. 40, 50, 63 L. Ed. 2d 186, 100 S. Ct. 906 (1980)).[2]

The Legislature's decision to exempt certain proceedings involving crimes against children from the spousal testimony privilege reflects a policy intent to subordinate the testimonial bar to "the 'overriding and paramount legislative intent to protect children from physical and sexual abuse.'" *See McKinney,* 50 Wn. App. at 64 (quoting *Waleczek,* 90 Wn.2d at 751). The Legislature's purpose was to facilitate disclosure in child abuse cases, so that offenders would be punished and children protected from further mistreatment. *State v. Lounsbery,* 74 Wn.2d 659, 663, 445 P.2d 1017 (1968). For these reasons, we find it appropriate to liberally interpret the term "guardian" as it is used in RCW 5.60.060(1) and hold that it applies to the situation

---

[2]In *Trammel,* the United States Supreme Court abolished the right of a defendant in a federal criminal trial to claim the benefit of his wife's incompetency, retaining the *witness* spouse as the only holder of the privilege.

presented here.[3] *See Waleczek,* 90 Wn.2d at 752; *Bouchard,* 31 Wn. App. at 387.

In this case, we have a preschool–aged child who visited a neighbor at will, unescorted by her parents. *Cf. Bouchard,* 31 Wn. App. at 387 (holding on similar facts that marital privilege was not a bar to defendant's wife's testimony). The neighbor willingly received the child, and the parent testified that she had an understanding with the Woods that "if they didn't want [J.] over that they would send [J.] back home". Such an understanding is common between parents of young children and their neighbors, and reflects the fact that adults recognize that a young child who visits needs caring for in a myriad of ways. Thus, although there was no testimony of an express agreement between J.'s parents and Wood to care for J. for a specific time or with a specific purpose, his consent to and knowledge of the presence of a child so young in his home or on his property, even for a short time, implies an assumption of certain obligations "incident to the parental relation". *See Waleczek,* 90 Wn.2d at 753; *Bouchard,* 31 Wn. App. at 387. Furthermore, when an adult engages in play with another's

---

[3]At the time of trial, Wood and Loretta were separated. We cannot rely on that fact for our holding, since our Supreme Court has specifically held that the privilege applies even if the marriage is in name only. *See State v. Grasser,* 60 Wn.2d 343, 374 P.2d 149 (1962). We question that rationale, however, since in other contexts our courts have distinguished between viable marriages and those in which only "the shell of the marriage contract" remains. *See Grasser,* 60 Wn.2d at 347 (Finley, C.J., dissenting). As we have held, the policy of protecting domestic harmony pales in light of the policy of preserving evidence in cases of child abuse. When there is no domestic harmony to protect, we believe the policy supporting a spousal privilege does not merely pale; it withers and dies. As the Supreme Court said in *Trammel,*

> When one spouse is willing to testify against the other in a criminal proceeding—whatever the motivation—their relationship is almost certainly in disrepair; there is probably little in the way of marital harmony for the privilege to preserve.

*Trammel v. United States,* 445 U.S. 40, 52, 63 L. Ed. 2d 186, 100 S. Ct. 906 (1980).

child, he or she takes on a "parental dut[y]," albeit one less onerous than others.[4]

We therefore find no error in the trial court's ruling that Wood was acting as J.'s guardian at the time the crime against J. occurred. We affirm.

SCHOLFIELD, C.J., and WEBSTER, J., concur.

---

[4]The trial court applied similar reasoning when it said "all of us who have been parents . . . play with their children. That's part of being a parent."