[No. 53423-8-I.   Division One.   February 28, 2005.]

CARRISSA A. BARBEE, *Petitioner*, v. THE LUONG FIRM, P.L.L.C., ET AL., *Respondents*.

---

150

*Carrissa A. Barbee*, pro se.

*James K. Barbee*, for petitioner.

*Judith A. Lonnquist* (of *Law Offices of Judith A. Lonnquist, P.S.*) and *Robert M. McKenna, Attorney General*, and *Shelley Kostrinsky, Assistant*, for respondents.

¶1 BECKER, J. — Carrissa Barbee filed a lawsuit against her former employer. Her husband, James Barbee, represented her. During her deposition, Barbee mentioned that before the lawsuit she had discussed with James certain events leading up to it. The court concluded James was a necessary witness and disqualified him from serving as Barbee's attorney. Because a mere reference to the subject matter of a conversation does not serve as a waiver of the spousal privileges, we reverse the order of disqualification.

¶2 The Luong Law Firm employed Carrissa Barbee as an attorney from October 2001 until her termination on January 16, 2003. Her marriage to James took place sometime between those dates. Acting pro se, Barbee filed suit against the firm in March 2003, alleging wrongful termination and other related causes of action.

¶3 The complaint alleged that when Barbee first accepted employment, Susan Luong told her that she would be responsible for paying her own social security tax, as she would be an independent contractor and not an employee of the firm. In time, Barbee came to the conclusion that she was an employee, due to the nature and scope of her work and the control that the firm exerted over her work product. She submitted a memorandum to Luong and the firm asserting that she was an employee and the firm should be paying the applicable taxes. Luong allegedly replied that she did not have time to read the memorandum.

¶4 Barbee confronted Luong about other conduct by the firm that she believed was improper. According to Barbee, the incident that led to her termination was being asked to take over a trial for a client who had previously stated that Barbee should not work on her case. Barbee refused even after Luong said she had persuaded the client to change her mind. The trial was one week away, and Barbee says she believed that she could not represent the client on such short notice without committing malpractice. Within days of this discussion, Luong fired Barbee.

¶5 Soon after Barbee filed suit, her husband James, who is also an attorney, began representing her in the lawsuit. The firm took Barbee's deposition in two sessions. Barbee testified that she had discussed certain matters relevant to her employment with James before the lawsuit and that he had tried to help her get her job back. Based on this testimony, the firm moved to disqualify James from acting as Barbee's attorney under the Rules of Professional Con-

duct[1] on the grounds that he is a necessary witness. The firm contends James is a necessary witness because he has personal knowledge of the events giving rise to the litigation as well as Barbee's alleged emotional distress. The firm contends that the issues about which James has knowledge are not "mere formalities" but "go to the very heart of this lawsuit."[2]

¶6 The trial court agreed that James was likely to be a necessary witness. In response to Barbee's argument that James was legally unavailable as a witness due to the statutory marital privilege, the court ruled that "any claim of marital privilege pursuant to RCW 5.60.060 has been waived pursuant to the responses Ms. Barbee provided in her deposition."[3] Barbee's appeal from this ruling is before this court on discretionary review.

¶7 The firm contends the following deposition testimony constituted a waiver of one or both of the two spousal privileges granted by RCW 5.60.060:

[TESTIMONY 1:]

Q. So during that initial follow-up phone call Ms. Luong may have mentioned something about you would be paying your own taxes, but you're not certain?

A. I'm not certain. I think I discussed it over with Jim and decided to question her again about it, about the tax issue.

. . . .

---

[1]  A lawyer shall not act as advocate at a trial in which the lawyer or another lawyer in the same law firm is likely to be a necessary witness except where:

(a) The testimony relates to an issue that is either uncontested or a formality;

(b) The testimony relates to the nature and value of legal services rendered in the case; or

(c) The lawyer has been called by the opposing party and the court rules that the lawyer may continue to act as an advocate; or

(d) The trial judge finds that disqualification of the lawyer would work a substantial hardship on the client and that the likelihood of the lawyer being a necessary witness was not reasonably foreseeable before trial.

Rules of Professional Conduct 3.7.

[2] Br. of Resp't at 21.

[3] Clerk's Papers at 111.

Q. And so, after that follow-up discussion from Ms. Luong when she offered you the associate attorney position, what next happened with respect to your decision-making process?

A. As I said, I discussed it with Jim and we decided that I would take the position with the Luong Law Firm.[4]

[TESTIMONY 2:]

Q. And did you, in fact, draft the will?

A. Yes, I did.

Q. And did you receive assistance from anyone?

A. I may have consulted with my husband's uncle, because he has a lot of experience drafting wills. I may have consulted with my husband about specifics as to how to—you know, different clauses to put in a will.

Not about the specifics of the case, but about things that I thought should be in there based on my limited understanding of wills.[5]

[TESTIMONY 3:]

Q. Did you discuss it [being assigned a case a week before trial] with anyone else other than Shelley or Romy?

A. Oh, I'm sure that I've discussed it with my husband.[6]

[TESTIMONY 4:]

Q. Was it your understanding that you were ever evaluated by Ms. Luong at any point in time during your affiliation with the firm?

A. We never, to my knowledge, had a formal evaluation. I would have expected that if Ms. Luong had a problem with my representation of the clients, she would have told me. She never told me otherwise.

The only thing I can think of is in January, when she gave me the raise, that she was obviously happy with my work. And I know that she told my husband that she was happy with my work at the end of 2002.[7]

[TESTIMONY 5:]

---

[4] Clerk's Papers at 66-68.

[5] Clerk's Papers at 70.

[6] Clerk's Papers at 72.

[7] Clerk's Papers at 73.

Q. Did you ever perform any work for your mother's business while situated at the Luong Law Firm?

A. My mother sold her business, and I recall that I brought some forms home for my husband to draft for me, and then when he was done I brought them back to the firm and e-mailed them to her.[8]

[TESTIMONY 6:]

Q. You and your husband went back to your office?

A. Correct.

Q. And what happened then?

A. And my husband confronted Ms. Luong about—

Q. Were you present at that point?

A. Yes, I was present. There were other people that were present, also.

. . . .

Q. And tell me about your husband's confrontation with Ms. Luong.

A. He asked her if there was any way that we could sit down and discuss this. He asked her if there was any way that I could have my job back, if there was anything at all that I could do.

He told her that the reason I was crying was because I believed that she was my friend. And he tried to get her to talk about settling this before I went and reported her to different agencies.

And she refused to talk about settling the issue. And he offered to see if there was anything at all that I could do, do the trial, anything at all. And she refused.

Q. What, if anything, did Ms. Luong say during this confrontation?

A. She said something about that she couldn't be bought or something like that. And Jim was just trying to tell her that, you know, it would be a good idea now to cut your losses before we go and report this to people, and no one's trying to buy you.[9]

---

[8] Clerk's Papers at 74.

[9] Clerk's Papers at 136-37.

The question is whether Barbee's testimony as recorded in these excerpts from her deposition waived the marital privileges so as to permit the firm to call James as a witness.

¶8 The statute defines two distinct privileges:

A husband shall not be examined for or against his wife, without the consent of the wife, nor a wife for or against her husband without the consent of the husband; nor can either during marriage or afterward, be without the consent of the other, examined as to any communication made by one to the other during marriage. But this exception shall not apply to a civil action or proceeding by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other, nor to a criminal action or proceeding against a spouse if the marriage occurred subsequent to the filing of formal charges against the defendant, nor to a criminal action or proceeding for a crime committed by said husband or wife against any child of whom said husband or wife is the parent or guardian.

RCW 5.60.060(1).

¶9 The broader of the two privileges defined by the statute is the marital testimonial privilege—a husband shall not be examined for or against his wife without her consent, nor a wife for or against her husband without the consent of the husband. This privilege reflects the "natural repugnance" of having one spouse testify against the other and prevents the testifying spouse from having to " 'choose between perjury, contempt of court, or jeopardizing the marriage.' " *State v. Burden*, 120 Wn.2d 371, 375, 841 P.2d 758 (1992) (quoting *State v. Wood*, 52 Wn. App. 159, 163, 758 P.2d 530 (1988)).

¶10 The second and entirely distinct privilege defined by the statute relates to confidential communications between a married couple—neither shall, during marriage or afterwards, without the consent of the other, be examined as to any communication made by one to the other during marriage. This privilege is intended to encourage "that free interchange of confidences that is necessary for mutual

understanding and trust." *State v. Thorne*, 43 Wn.2d 47, 55, 260 P.2d 331 (1953). It is based on the premise that "the greatest benefits will flow from the relationship only if the spouse who confides in the other can do so without the fear that at some later time what has been said will rise up to haunt the speaker." *Thorne*, 43 Wn.2d at 55.

■ ¶11 The privilege against the divulging of confidential communications survives death or divorce. It applies to all "actually successful" confidential communications made between the spouses while they are husband and wife. *Swearingen v. Vik*, 51 Wn.2d 843, 848, 322 P.2d 876 (1958). In this respect, it is analogous to other privileges surrounding confidential communications, such as attorney-client, priest-penitent, and physician-patient. *Swearingen*, 51 Wn.2d at 848.

■ ¶12 The confidential communications privilege belongs to, or may be asserted by, the communicating spouse; the hearing or receiving spouse is ordinarily not entitled to object. *Swearingen*, 51 Wn.2d at 848. The spouse who possesses the privilege may waive it. " 'The waiver may be found in some extrajudicial disclosure, or in some act of testimony which in fairness places the person in a position not to object consistently to further disclosure.' " *Swearingen*, 51 Wn.2d at 848 (quoting 8 WIGMORE ON EVIDENCE 658-59, § 2340 (2d ed.)). Thus, when the communication is heard by others, it is not protected. The third party who hears it may testify to it, *Thorne*, 43 Wn.2d at 56; and the hearing spouse may testify to it if not prevented from doing so by the testimonial privilege. *State v. Wilder*, 12 Wn. App. 296, 299, 529 P.2d 1109 (1974).

¶13 The firm argues that Barbee waived both privileges through her deposition testimony.

¶14 The only excerpts of Barbee's testimony that could be covered by the spousal communications privilege are Testimony 2, where Barbee says that she may have consulted with James about how to draft a will, and Testimony 3, where she says she certainly discussed with him the assignment to take over the trial on short notice. The

conversation mentioned in Testimony 1 is not covered by the communications privilege because it occurred before the Barbees were married.

¶15 Considering the analogy between the spousal communications privilege and other privileges involving confidential communications, we conclude Barbee's reported disclosures of topics she discussed with James after their marriage were not sufficiently detailed to waive the privilege. *See United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) (subject to concerns of fairness and consistency, disclosure of only the topic of a confidential communication with one's attorney—but not the substance—does not waive the attorney-client privilege); *accord Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999).

¶16 Even if Barbee had waived the confidential communications privilege, the firm would still have to show a waiver of the broader testimonial privilege. The marital testimonial privilege, unless waived, allows Barbee to prevent James from being called as a witness on any topic without her consent.

¶17 The firm is particularly interested in having James testify about his confrontation with Susan Luong at the law office after the firm terminated Barbee. As Barbee described this event in Testimony 6, James offered that Barbee would indeed agree to handle the trial she had insisted she was unprepared for, if only the firm would take her back.

¶18 The firm contends Barbee forfeited her privilege to prevent James from being examined as to all matters she mentioned in which James was involved by testifying about them freely and openly and without objection during her deposition. For this proposition, the firm relies on *State v. Clark*, 26 Wn.2d 160, 173 P.2d 189 (1946). In *Clark*, a husband and wife were convicted of committing a murder together. During the investigation, each made inculpatory admissions to a police officer about how the murder was accomplished. At the time, the courts interpreted the testimonial privilege broadly. Just as one spouse could not be called to testify in court against the other, so too a third

person—the police officer—could not be permitted to relate a statement made out of court by one spouse against the other. *Clark*, 26 Wn.2d at 168. The trial court allowed the officer to testify only about the statements that each spouse made relating to his or her own part in the murder. When this ruling came up on appeal, the Supreme Court found no error, and gave two reasons. First, the testimonial privilege "may be waived . . . expressly or impliedly." By talking to the police officer "freely and voluntarily," and each with the other's consent, the spouses waived their rights to object to the officer's trial testimony about their admissions. Second, even if there was no waiver, trial counsel scrupulously followed the trial court's ruling so that neither spouse's statement was the equivalent of being examined "against" the other in violation of the testimonial privilege. *Clark*, 26 Wn.2d at 168-69.

¶19  The Supreme Court later overruled *Clark*, in part, in *State v. Burden*, 120 Wn.2d 371, 376-77, 841 P.2d 758 (1992). *Burden* holds that the testimonial privilege excludes only the in-court testimony of a spouse; it does not exclude testimony by third persons about a spouse's extrajudicial statements that are otherwise admissible. *Burden*, 120 Wn.2d at 376-77.

■ ¶20  We now conclude *Clark* is also not good authority (if it ever was) for the proposition that a wife who openly discusses her husband's words and conduct thereby waives the testimonial privilege. *Clark* held that open discussion waives the right to object to the testimony of a third party, relating what the other spouse said, but *Clark* did not comment on waiver of the right to object to testimony by one's spouse. *Burden*, by holding that the privilege does not prohibit third party testimony, renders *Clark*'s discussion of waiver superfluous.

¶21  We are not aware of any other authority arguably supporting the proposition that a spouse's disclosure during a deposition, even if full of details, waives the testimonial privilege. Unlike the communications privilege, which serves the purpose of protecting confidences and therefore

can be waived by allowing others to hear them, the testimonial privilege protects the marriage. That protection is typically lost by divorce, not by an unguarded disclosure.

¶22 It is true that privileges are narrowly construed to serve their purposes so as to exclude the least amount of relevant evidence. *Burden*, 120 Wn.2d at 377. Moreover, "the privilege to bar a spouse's adverse testimony, particularly when no confidential communications are involved, is not highly favored by legal commentators." *Wood*, 52 Wn. App. at 163 (liberally interpreting the "parent or guardian" exception to the statutory privileges; permitting a wife, without husband's consent, to testify against husband accused of molesting neighbor girl as to whom he occupied a position of trust). Nevertheless, a trial court does not have discretion to refuse to give effect to the statutory testimonial privilege where it directly applies. *State v. White*, 50 Wn. App. 858, 751 P.2d 1202 (1988). Once the privilege is asserted, "one spouse is then incompetent to testify for or against the other as to all matters, and the restriction is not limited merely to confidential communications between them." *State v. Tanner*, 54 Wn.2d 535, 537, 341 P.2d 869 (1959).

¶23 Barbee acknowledges that in order to preserve the testimonial privilege she must make an appropriate objection before James testifies. *See Tanner*, 54 Wn.2d at 537. Since James has not given any testimony, it follows that Barbee is correct in maintaining that she did not waive the privilege simply by testifying in her own deposition. Barbee's deposition merely served the purposes of discovery by allowing the firm to explore the basis of her claim and to identify other persons with knowledge about it.

¶24 However, Barbee also contends that the possibility of James' giving testimony for or against her should not become an issue unless and until he is called to testify. This absolute position tends to conflict with the practical reality that a disqualification order entered during trial almost certainly means delay and expense. From the firm's standpoint, waiting too long to bring a motion to disqualify James from being Barbee's attorney may mean that it will be

denied as too late. *See Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co.*, 124 Wn.2d 789, 812, 881 P.2d 1020 (1994). Accordingly, the firm and the court cannot be faulted for attempting to address well before trial the possibility that James may have to be a witness. The trial court may, in the interest of trial management, impose a deadline by which Barbee must decide whether or not she intends to call James as a witness. If she elects to keep that possibility open, the trial court may again take up the question of disqualification.

¶25 In summary, the trial court should not have disqualified James from acting as his wife's attorney on the basis that he would be a necessary witness. The record as currently developed does not show a waiver of either of the marital privileges. Because Barbee has not as yet waived either privilege, James cannot be a witness against her at all.

¶26 Barbee's alternative argument for reversal, that James has a right to continue as counsel to defend his own interest against the firm's counterclaims, is insignificant in the present posture of the case and we see no purpose to be served by evaluating it at this time.

¶27 The order of disqualification is reversed.

Cox, C.J., and Coleman, J., concur.